AO 91 (Rev. 11/11)  Criminal Complaint

FILED BY ___TM___ D.C.

NOV 1 4 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| WILLIAM FOSTER, | ) | 19-8472-BER |
| | ) | |
| | ) | |
| _Defendant(s)_ | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ____8/2004 - 9/6/2019____ in the county of ____Palm Beach____ in the
____Southern____ District of ____Florida____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1591 | Sex Trafficking of a Minor, or by Force, Threats of Force, Fraud or Coercion |
| 18 U.S.C. § 1594 | Conspiracy to Sex Traffic a Minor, or by Force, Threats of Force, Fraud or Coercion |
| 18 U.S.C. §§ 2421 and 2 | Transportation with Intent to Engage in Prostitution |

This criminal complaint is based on these facts:

PLEASE SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_____
_Complainant's signature_

Kelly Cavey, FBI
_Printed name and title_

Sworn to before me and signed in my presence.

Date: __11/14/19__

_____
_Judge's signature_

City and state:       West Palm Beach, Florida

Bruce E. Reinhart, United State Magistrate Judge
_Printed name and title_

## AFFIDAVIT

Your Affiant, Kelly Cavey, a Special Agent with the Federal Bureau of Investigation ("FBI"), being duly sworn, hereby state:

## INTRODUCTION

1.      I am a Special Agent with the FBI and have been so employed since August 2016. As such, I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am empowered by law to conduct investigations of, and to execute both search warrants and arrest warrants for, federal offenses enumerated in Titles 18 and 21 of the United States Code.

2.      I am currently assigned to the Homestead Resident Agency of the Miami Division, where my duties include the investigation of a variety of federal offenses, including but not limited to, offenses involving the interstate transportation of individuals for purposes of prostitution, in violation of 18 U.S.C. § 2421; money laundering, in violation of 18 U.S.C. §§ 1956 and 1957; and sex trafficking of children, or by force, threats of force, fraud, or coercion, in violation of 18 U.S.C. § 1591. I have received training on a variety of topics including human trafficking and the use of the internet, social media, and electronic devices by sex traffickers. Based on my training and experience, I am familiar with the dynamics commonly involved in the transportation of individuals for purposes of prostitution and domestic sex trafficking. I am also familiar with the tactics and recruitment methods typically used by "pimps" and sex traffickers.

3.      I am submitting this affidavit in support of a criminal complaint, which charges William FOSTER with conspiring to sex traffic minors, and by force, threats of force, fraud, and coercion, in violation of Title 18, United States Code, Sections 1591 and 1594, and knowingly

transporting any individual in interstate or foreign commerce, with the intent that such individual engage in prostitution, in violation of Title 18, United States Code, Sections 2421 and 2.

4.      Since this affidavit is being submitted for the limited purpose of securing a criminal complaint, I have not included each and every fact known by me concerning this investigation. I have included only those facts and circumstances that I believe are sufficient to establish probable cause for the issuance of a criminal complaint. The information contained in this affidavit is based upon my personal knowledge and observations, my training and experience, and information obtained from other law enforcement officers and witnesses.

## BACKGROUND OF THE INVESTIGATION

### A. VICTIM 1 AND VICTIM 2

5.      In or around February 2017, the FBI made contact with an adult female (hereinafter referred to as VICTIM 1) who reported being recruited into FOSTER's organization in or around August 2007 as a minor, and being commercially sex trafficked by FOSTER both as a minor, and then as an adult, from approximately November 2007 through May 2010. VICTIM 1 reported that, during this time period, she was moved across state lines for purposes of prostitution, which was conducted as part of a criminal group led by FOSTER. Because VICTIM 1 was a minor, FOSTER arranged for VICTIM 1 to obtain a false identification. VICTIM 1 stated that she engaged in sex with FOSTER on numerous occasions, beginning when she was a minor.

6.      In or around June 2017, the FBI met with another adult female (hereinafter referred to as VICTIM 2), who reported being recruited into FOSTER's organization in or around August 2004, as a minor. VICTIM 2 reported being commercially sex trafficked by FOSTER from

2

approximately 2004 through 2011.[1]  VICTIM 2 also reported that she was moved across state lines for purposes of prostitution, which was conducted as part of a criminal group led by FOSTER. FOSTER also arranged for VICTIM 2 to obtain a false identification because she was a minor. VICTIM 2 stated that she engaged in sex with FOSTER on numerous occasions, beginning when she was a minor.

7.      VICTIM 1 and VICTIM 2 reported that FOSTER knowingly trafficked minors as part of his effort to profit from the commercial sex scheme.  VICTIM 1, for example, reported that she was recruited out of high school while in foster care.  VICTIM 1 further reported that, while employed by FOSTER, he told her that the best places to recruit minors and young women were from group homes, shelters, and exotic dance venues, including low-end venues where the young women may have violent pimps, because minors and young women at those locations were vulnerable and in need of help.

8.      Furthermore, VICTIM 2 reported that, in or around 2004, at age seventeen, she was kidnapped by a violent pimp who forced her to work at Gold Rush in Miami, Florida.  One night, while employed by the violent pimp, VICTIM 2 was brought to the VIP/Champagne Room and introduced to FOSTER.  FOSTER recruited VICTIM 2, describing the females in his organization as exotic dancers who owned a business with him and who drove nice cars and had wonderful

---

[1] VICTIM 2 reported that during the period from 2004 to 2011 that she was with FOSTER, she left FOSTER for approximately one (1) year.

wardrobes. FOSTER told VICTIM 2 that if she wanted to live with him, she would have to become his girlfriend. VICTIM 2 advised FOSTER that she was seventeen years old during this meeting.

9.     Based on reporting from VICTIM 1 and VICTIM 2, at any given time approximately five (5) to fifteen (15) females lived with, and worked for FOSTER as prostitutes and/or sex trafficking victims.

10.     VICTIM 1 and VICTIM 2 both advised law enforcement that FOSTER used displays of a fun and wealthy lifestyle as a way to recruit new females. VICTIM 2 reported that while she resided with FOSTER, the females working for FOSTER drove high-end cars, including a Ferrari, Escalade, Mercedes, and a Corvette.

11.     Additionally, VICTIM 1 and VICTIM 2 reported that FOSTER made physical appearance a priority among the females. VICTIM 2 reported that females were placed on a "lemon diet" and FOSTER arranged and funded cosmetic surgery for the women, including breast augmentation surgery, buttock injections, rhinoplasties, and rib removals. FOSTER advised the females that he viewed the cosmetic procedures as investments.

12.     VICTIM 1 and VICTIM 2 reported that FOSTER groomed the females. Further, VICTIM 1 reported that FOSTER taught them how to target wealthy men as prostitution clients at various exotic dance venues in Miami-Dade, Broward, and Palm Beach Counties, where the females were employed. Additionally, the females would meet new prostitution clients through individuals known to FOSTER and would attend yacht parties and dinners for wealthy clients.

13.     VICTIM 1 and VICTIM 2 advised that the females working for FOSTER collectively made thousands of dollars each night from prostitution and exotic dancing. The females were not able to keep any proceeds derived from their prostitution or exotic dancing. Instead, each night, the females would return to FOSTER's residence and immediately hand over

any cash earned to one of FOSTER's "main girls."[2] The "main girl" would then immediately place the cash in a safe. VICTIM 1 advised law enforcement that FOSTER was often present to observe the collection and securing of the cash.

14.    VICTIM 1 and VICTIM 2 further reported that FOSTER told them that their earnings were being invested on their behalf into businesses for their early retirement, however, when they left FOSTER's organization they were not given any of their earnings. VICTIM 1 reported instances where she tried to leave FOSTER but FOSTER would tell her that if she left, she would have no stake in the businesses that he had "invested" her earnings into. In order to receive a share of the business profits she would have to stay with, and continue working for, FOSTER. When VICTIM 1 eventually left the organization in 2010, she was not provided with any of her earnings.[3]   VICTIM 2 similarly reported that even though she had access to the organization's finances at the time that she left FOSTER in 2011 because she was one of his main girls at that time, she did not take any money for fear of what physical harm he may cause her.

15.    One of the business investments was a clothing line called Bad Girlz Fashion, Inc. A review of records from the Florida Department of State, Division of Corporations revealed that Bad Girlz Fashion, Inc. was incorporated in the State of Florida on May 15, 2003. FOSTER was listed as the vice president and director of the company. FOSTER's parents were also listed on

---

[2] Based on my training and experience, I understand "main girl" to refer to the female that is typically the most trusted in the organization, who assists with handling the money earned by the other females and who assists with the recruitment and grooming of new females.

[3] While FOSTER did not provide VICTIM 1 with any of the earnings that she turned over to him throughout the time that she was part of his organization, after leaving FOSTER in 2010, VICTIM 1 advised law enforcement that FOSTER provided her with what she believed was a check made out to VICTIM 1 from one of the exotic dance venues that she had worked at in New York while working for FOSTER.

the corporate records. Records from the Florida Department of State, Division of Corporations, show that Bad Girlz Fashion, Inc. was dissolved on September 28, 2012.

16.     VICTIM 1 reported that FOSTER also tracked the movements of the women in his organization by monitoring emails, contacts, social media, and online search history of the females in the house. On one occasion, FOSTER explained to VICTIM 1 that he did so because he wanted to know if a female was planning to leave or runaway, was stealing or pocketing money, had a boyfriend, or was lying to him. VICTIM 1 further reported that she had to text or call FOSTER when she left an exotic dance venue with a prostitution client and had to call or text FOSTER when she finished with that client. VICTIM 2 also reported having to call or text FOSTER when she was meeting with a client. VICTIM 1 further explained that she communicated with FOSTER because he wanted to know how much she was earning per hour from the prostitution clients she was meeting with outside the exotic dance venues, what services she was providing to those clients, and whether drugs were provided to the clients. On certain occasions, FOSTER had VICTIM 1 and VICTIM 2 put him on speakerphone so that he could hear VICTIM 1 and VICTIM 2 engage in sexual acts with the client.

17.     VICTIM 1 and VICTIM 2 further reported that FOSTER used deceit, manipulation, and fear of physical harm to cajole women and minor females to engage in commercial sex for the benefit of FOSTER's organization. Furthermore, VICTIM 1 and VICTIM 2 both reported incidents where FOSTER had either been violent toward them, or toward other women, in the house. VICTIM 2, for example, advised that FOSTER hit her on one occasion. She wanted to leave FOSTER and was in the process of packing her belongings. FOSTER pushed VICTIM 2 onto the bed and punched her head. Another female was present and prevented FOSTER from hitting VICTIM 2 further.

18.     VICTIM 1 and VICTIM 2 advised that the females who worked for FOSTER also traveled to various locations outside of the state, including Nevada and New York in order to have commercial sex.  VICTIM 2 advised law enforcement that FOSTER's organization used South Florida as its home base and the organization would return to South Florida after completing out of state prostitution ventures.  VICTIM 1 and VICTIM 2 further advised that FOSTER directed where the females would travel.

19.     VICTIM 1 advised that in or around 2008 or 2009, FOSTER directed VICTIM 1 and approximately six (6) other women, including VICTIM 2, to move to the tristate area to work at exotic dance venues in New York and engage in prostitution because FOSTER believed they would make more money there.[4]  Ultimately, VICTIM 2, along with other females in FOSTER's organization returned to South Florida from New Jersey in or around the beginning of 2011.  Upon their return, the women continued to engage in commercial sex and give all proceeds to FOSTER. VICTIM 2 advised that she left FOSTER in the latter half of 2011 and moved out of South Florida.

20.     At some point between 2014 and 2016, VICTIM 2 moved back into FOSTER's residence for approximately three (3) weeks to a month.  While living with FOSTER, VICTIM 2 observed females at the house handing money to both FOSTER and FOSTER's new "main girls." VICTIM 2 also recalled that the patterns and routines of the females were the same as when she had previously resided with FOSTER.  VICTIM 2 further reported that FOSTER told her that he

---

[4] VICTIM 1 left FOSTER while he and the other women continued to reside in the tristate area in approximately May of 2010.

7

still had VICTIM 1's birth certificate and social security card.  During this time, FOSTER asked VICTIM 2 to return to work for him but VICTIM 2 declined.

21.     VICTIM 2 saw FOSTER for the last time in or around December 2016.  At that meeting, FOSTER advised VICTIM 2 that he was moving with the females to Las Vegas, Nevada. Law enforcement has reviewed bank records, travel records, business records, and social media websites that confirm that FOSTER, along with other females identified as working for FOSTER, moved to Las Vegas, Nevada in or around late 2016 or early 2017.

22.     Through further investigation, including review of bank records, travel records, business records, and social media websites, law enforcement ascertained that FOSTER's organization returned to South Florida in or around late 2017 or early 2018.

**B.  VICTIM 3**

23.     On or about September 6, 2019, an adult female, hereinafter referred to as VICTIM 3, contacted the National Human Trafficking Hotline through POLARIS,[5] requesting emergency extraction from a hotel located in Romulus, Michigan.  In response to the call, law enforcement made contact with VICTIM 3 at the hotel.  VICTIM 3 reported that she flew to Detroit, Michigan, from Fort Lauderdale, Florida, approximately two days earlier with two other females, hereinafter referred to as GIRL 1 and GIRL 2.  VICTIM 3 stated that four other females, hereinafter referred to as GIRL 3, GIRL 4, GIRL 5, and GIRL 6, that worked for FOSTER's organization went to Michigan approximately one week earlier and all seven females were staying at the hotel in Romulus and sharing rooms.  While in Michigan, VICTIM 3 reported that the other six females were engaging in commercial sex at various exotic dance venues in the Detroit area at

---

[5] According to POLARIS' website, www.polarisproject.org, POLARIS is a nonprofit organization that works to combat and prevent modern-day slavery and human trafficking.  POLARIS runs a National Human Trafficking Hotline.

the direction of FOSTER.  VICTIM 3 reported that she was being pressured to engage in commercial sex by FOSTER and his organization and she did not want to do so.  VICTIM 3 also reported that she had wanted to leave, but that she was told she could not leave because the females that she had traveled with from Florida to Detroit had not yet met the group's "financial goal," which they had to meet before returning to Florida.

24.     VICTIM 3 advised law enforcement that she met MAIN GIRL 2 in mid-August 2019 at a nightclub in Broward County, Florida at which time MAIN GIRL 2 provided VICTIM 3 with her telephone number.  VICTIM 3 is a recovering heroin addict.  Approximately one week after meeting MAIN GIRL 2, VICTIM 3 contacted MAIN GIRL 2.  MAIN GIRL 2 picked up VICTIM 3 and they went to an exotic dance venue in Hallandale Beach, Florida.  While there, MAIN GIRL 2 introduced VICTIM 3 to FOSTER.  VICTIM 3 informed MAIN GIRL 2 and FOSTER of her current living situation, which she described as dysfunctional.  In response, MAIN GIRL 2 and FOSTER advised VICTIM 3 that she should leave and move in with them.  FOSTER told VICTIM 3 that he would help her get back on her feet.

25.     Upon departing from the exotic dance venue, MAIN GIRL 2 drove VICTIM 3 to get her belongings and brought VICTIM 3 to a residence located at 2941 Angler Drive, Delray Beach, Florida (hereinafter referred to as the "Angler residence").  Soon after VICTIM 3 arrived, FOSTER came to pick up VICTIM 3 and drove her to another residence associated with FOSTER's organization located at 4630 Sherwood Forest Drive, Delray Beach, Florida (hereinafter referred to as the "Sherwood Forest residence"), which FOSTER identified as his own residence.  VICTIM 3 had sexual intercourse with FOSTER during that initial meeting at Sherwood Forest residence.  SUBECT 1 then drove VICTIM 3 back to the Angler residence where she resided until travelling to Detroit, Michigan.

26.     The next morning, VICTIM 3 was told by FOSTER and MAIN GIRL 2 that she needed to go on the lemon juice diet and lose weight if she wanted to get the cosmetic surgeries that FOSTER would provide.

27.     VICTIM 3 reported that the females had high end designer clothes, shoes and handbags, to include Versace, Fendi and Gucci. Additionally, VICTIM 3 observed luxury vehicles parked at the Angler residence and driven by females of FOSTER's organization.

28.     VICTIM 3 reported that members of FOSTER's organization told her that they engaged in commercial sex at exotic dance venues in south Florida. VICTIM 3 observed MAIN GIRL 1, GIRL 2, GIRL 4, and GIRL 5 residing at the Angler residence. VICTIM 3 observed the females depart the Angler residence to go to work at the exotic dance venues and overheard them share strategies on how to make more money.

29.     FOSTER explained to VICTIM 3 that the females worked in exotic dance venues and pooled their money to invest in businesses. VICTIM 3 advised law enforcement that FOSTER owned a company called "Power of Women," abbreviated "POW." Additionally, FOSTER mentioned to VICTIM 3 that he was trying to open up his own exotic dance venue.

30.     At the direction of FOSTER, VICTIM 3 and the other six females traveled to Detroit, Michigan. FOSTER advised that due to the impending hurricane in or around early September 2019, the females would not be able to earn money in Florida and therefore needed to go to Detroit to make money. At the Angler residence, VICTIM 3 observed MAIN GIRL 1 purchase VICTIM 3's plane ticket to Detroit on a laptop. VICTIM 3 further reported that two vehicles belonging to the females within the organization were shipped to Detroit from Florida.

31.     VICTIM 3 reported that she did not want to travel to Detroit but FOSTER told her that she had to go. At the time, VICTIM 3 believed she would be working as an exotic dancer in

Detroit. Upon arrival in Detroit, VICTIM 3 was told by FOSTER and other females in FOSTER's organization that she had to engage in commercial sex. VICTIM 3 was told to work at an exotic dance venue, which she described as a brothel with females having sex with clients in the upstairs area.

32.     VICTIM 3 advised law enforcement that she called FOSTER from Michigan to ask him to dance at another exotic dance venue that would allow her to make more money as a dancer, FOSTER refused and told VICTIM 3 that she had to have sex for money with clients. VICTIM 3 overheard a conversation between FOSTER and one of the members of FOSTER's organization in which FOSTER directed the females not to allow VICTIM 3 to leave Detroit until she earned enough money to reimburse the cost for the flight, hotel and expenses.

33.     While in Detroit, VICTIM 3 reported that the other six females engaged in commercial sex. During meetings, which were held every night before work, VICTIM 3 heard the females discuss strategies on the best way to get the most money from clients. Every night, VICTIM 3 had to provide all her earnings to one of the members of FOSTER's organization and observed the other females do the same. VICTIM 3 reported that GIRL 3 would deposit the money the following day into the bank. VICTIM 3 reported that the females had to collectively earn approximately $150,000 while in Detroit.

34.     On September 6, 2019, the night that VICTIM 3 was recovered by law enforcement, law enforcement assisted VICTIM 3 in recovering her belongings from the hotel room. While in the room, law enforcement observed a handwritten thermometer gauge chart depicting the goal progress with a listed goal of approximately $60,000. The chart indicated that, as of September 5, 2019, an amount of approximately $36,996 had been reached. Law enforcement also observed handwritten notes with instructions, to include an improvements section that is consistent with

prostitution. For example, notes such as "grab penis," "try to negotiate but take offer," and "pee afterwards." Further, law enforcement observed a Bill of Lading for a Nissan Altima and a Kia Optima shipped from MAIN GIRL 1 from Florida to Romulus, Michigan.

35.     Law enforcement interviewed GIRL 4 and GIRL 5 on site. GIRL 5 advised law enforcement that the females were in Michigan for only a short time to escape the impending hurricane. GIRL 5 further advised law enforcement that she shipped her vehicle, a Kia Optima, from Florida to Michigan. During the meeting, GIRL 5 received a phone call and provided the phone to GIRL 4 and referred to the caller by FOSTER's first name.

## C. FOSTER'S CARE, INC.

36.     During the course of the investigation, law enforcement identified Foster's Care, Inc. as a not-for-profit corporation incorporated on November 21, 2014, with FOSTER serving as President, MAIN GIRL 1 serving as Chief Financial Officer, and MAIN GIRL 2 serving as Vice President. The principal place of business listed for Foster's Care, Inc. is a known address in Florida associated with FOSTER's organization, where VICTIM 2 reported living with FOSTER after returning to Florida from the tristate area. A review of records obtained from the Florida Department of State, Division of Corporations revealed that the intended purpose of the not-for-profit corporation was to provide "social services, counseling, shelter & education, to the youth and young adults in the tricounty area." A search of public records revealed that Foster's Care, Inc. was dissolved on September 25, 2015.

37.     However, on or about September 27, 2019, law enforcement conducted a public search on the Internet, which revealed a website, www.fosterscareinc.com, that was created on or about July 26, 2019. The telephone number listed as the contact information on the website is the telephone number associated with, and utilized by, FOSTER. The business address listed is that

of a UPS store, which law enforcement identified as being utilized by members of FOSTER's organization.  Based upon a review of the website, Foster's Care, Inc. provides free services, to include housing, therapy, medical treatment, and job training, to victims of sex trafficking.  The website discusses the program, Changing Accepted Realities Effectively (C.A.R.E.), and defines the C.A.R.E. program as "a comprehensive restoration program for victims of Human Sex Trafficking."  A Google search of the C.A.R.E. program yielded negative results other than the website, www.fosterscareinc.com.  The website states that since the C.A.R.E. program's inception in 2008, the program has served over 140 women and provides "[p]rotection in partnership with police and FBI."  The "Contact Us" webpage on the website poses the question, "Are you a victim of the sex trade?" with the phrase "Contact Us Now" listed immediately below.

## ADDITIONAL FACTS IN SUPPORT OF PROBABLE CAUSE

38.    Law enforcement has identified three homes currently associated with FOSTER's criminal organization: (1) 4630 Sherwood Forest Drive, in Delray Beach, Florida (the "Sherwood Forest residence"), (2) 2941 Angler Drive, in Delray Beach, Florida ("Angler residence"); and (3) 4724 Franwood Drive, in Delray Beach, Florida ("Franwood residence").  On November 13, 2019, law enforcement executed searches on each of these residences.  In the Franwood residence, law enforcement found multiple bins of clothing consistent with exotic dancing as well as the notepad law enforcement had viewed in the hotel room in Romulus, Michigan, depicting a handwritten thermometer gauge chart with a listed goal of approximately $60,000.  In the Angler residence, law enforcement found two large boxes of condoms with over fifty condoms, as well as numerous designer goods such as purses and shoes, consistent with the reporting of VICTIM 3.  In the

Sherwood Forest residence, law enforcement found a money counter machine, luxury goods, and a safe.

39.     In a post-*Miranda* interview, FOSTER admitted that he had paid somebody to set up the Foster's Care website on his behalf.

## CONCLUSION

40.     Based on my training and experience, and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to support the arrest of William FOSTER for conspiring to sex traffic minors, and by force, threats of force, fraud, and coercion, in violation of Title 18, United States Code, Sections 1591 and 1594, and knowingly transporting any individual in interstate or foreign commerce, with the intent that such individual engage in prostitution, in violation of Title 18, United States Code, Sections 2421 and 2.

**FURTHER YOUR AFFIANT SAYETH NAUGHT.**

Respectfully submitted,

Kelly Cavey
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
this _14_ day of November, 2019.

BRUCE E. REINHART
UNITED STATES MAGISTRATE JUDGE

14

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 19-8472-BER

**UNITED STATES OF AMERICA**

**vs.**

**WILLIAM FOSTER,**

    **Defendant.**

_____/

### CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003?  \_\_\_\_\_ Yes  \_\_X\_\_ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007?  \_\_\_\_\_ Yes  \_\_X\_\_ No

     Respectfully submitted,
     ARIANA FAJARDO ORSHAN
     UNITED STATES ATTORNEY

BY:                  
     J. MACKENZIE DUANE
     ASSISTANT U.S. ATTORNEY
     Court No. A5502175
     99 N.E. 4th Street
     Miami, Florida 33132-2111
     TEL (305) 961-9341
     FAX (305) 536-7976