1

```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                          MIAMI DIVISION
                     CASE NO.  19-20804-CR-FAM
3

4      UNITED STATES OF AMERICA,

5                     Plaintiff,

6          vs.

7                                        West Palm Beach, Florida
                                         November 19, 2019
8      WILLIAM FOSTER,                   Pages 1-86

9                     Defendant.
       _____

10                     TRANSCRIPT OF DIGITALLY RECORDED
11                     PRETRIAL DETENTION HEARING
                  BEFORE THE HONORABLE BRUCE E. REINHART
12                   UNITED STATES MAGISTRATE JUDGE

13

       APPEARANCES:
14
       FOR THE PLAINTIFF:
15                          United States Attorney's Office
                            BY:  J. MACKENZIE DUANE,  A.U.S.A.
16                          BY:  JESSICA KAHN OBENAUF, A.U.S.A.
                            99 Northeast Fourth Street
17                          Miami,  Florida 33132

18
       FOR THE DEFENDANT:
19
                            BY:  DAVID A. HOWARD, ESQ.
20                          25 Southeast Second Avenue
                            Suite 1100
21                          Miami, Florida 33131

22

23     TRANSCRIBED BY:      DAWN M. SAVINO, RPR
                            Official Court Stenographer
24                          400 N. Miami Avenue, 10S03
                            Miami, Florida  33128
25                          Telephone:  305-523-5598
```

1          P-R-O-C-E-E-D-I-N-G-S

2          THE COURT:  Calling case number 19-8472, United States

3    of America versus William Foster.

4          May I have counsel's appearance, starting with counsel

5    for the Government.

6          MS. DUANE:  Good afternoon, Your Honor.  Mackenzie

7    Duane and Jessica Kahn Obenauf on behalf of the United States.

8          THE COURT:  Ms. Duane and Ms. Kahn Obenauf, good

9    afternoon.

10          And on behalf of Mr. Foster.

11          MR. HOWARD:  Good afternoon, Your Honor.  David Howard

12    on his behalf, and I appreciate you making the scheduling

13    accommodations.

14          THE COURT:  My pleasure, Mr. Howard.  Good to see you

15    again.  I see you've entered a temporary appearance as of this

16    time.  And I perceive that, and that will be filed in the

17    record.

18          Everybody can have a seat please.  That's fine.

19          All right.  So this was on -- just to recap for the

20    record, I know, Mr. Howard, you're somewhat new to the case,

21    plus the prosecutors weren't here the other day.  So let me kind

22    of recap where I know we are and then you can tell me where

23    we're going today.

24          MR. HOWARD:  Okay.

25          THE COURT:  I first saw Mr. Howard *(sic)*, I believe it

1   was last Thursday, for his initial appearance after his arrest.

2   I advised him of the charges against him; I advised him of the

3   maximum penalties; I advised him of his right to remain silent

4   and his right to counsel.  He indicated at that time that he

5   wanted to try to retain his own counsel, and he thought that he

6   had made arrangements -- I think this must have been Wednesday

7   -- he thought he made arrangements for counsel, but counsel

8   wasn't here.  It was not you, Mr. Howard.  So I told him I would

9   bring him back the next day because I didn't want him sitting in

10  jail any longer than he needed to if he was going to have a

11  pretrial detention hearing.  I did advise him of his right to a

12  detention hearing as well.

13          We brought him back, I think it was Friday, and at that

14  point he advised me, Mr. Howard, that he contacted you; he was

15  not going to be retaining the other gentleman, he was trying to

16  retain you.  So I said we'd set it for today, and then your

17  office contacted us and asked us to do it in the afternoon,

18  which I'm more than happy to do.

19          MR. HOWARD:  Thank you, sir.

20          THE COURT:  So as far as I understand, now you've

21  entered your appearance.  So he has a lawyer, temporarily

22  anyway, so we need to set a date for a status re: final counsel,

23  arraignment, and also I don't know if we're having a detention

24  hearing today or on another date, but we need to just nail that

25  down.

1          So let me turn to Mr. Howard and ask first, how much

2     time do you think you need to finalize whether you'll be

3     entering a permanent appearance in the case?

4          MR. HOWARD:  Thank you, Your Honor.  I think the 9th of

5     December is a date which the parties have agreed would be a date

6     on which they can present the indictment.

7          THE COURT:  Okay.

8          MR. HOWARD:  And I believe by that time, I would be

9     prepared to enter a permanent appearance.

10         THE COURT:  Okay.  So let me come back to my -- Ms.

11    McClendon, when had we set -- what was the original, the

12    original arraignment, preliminary hearing, I guess the

13    preliminary hearing date is December 2nd.  So what you're

14    proposing, Mr. Howard, is that Mr. Foster would waive his right

15    to have a preliminary hearing on December 2nd, we would extend

16    that out until some time after December the 9th, and at that

17    time you would also finalize your representation status.

18         Am I correct about that?

19         MR. HOWARD:  That is correct, sir.

20         THE COURT:  From the Government, any problem with

21    resetting the preliminary hearing arraignment date for the 9th

22    of December?

23         MS. DUANE:  No, Your Honor.

24         THE COURT:  Does that give you enough time to get to

25    the grand jury?

1          MS. DUANE:  Yes, Your Honor.  Thank you.

2          THE COURT:  All right.  Great.  And Mr. Howard, the

3    only thing I'll ask you is if it turns out in the interim that

4    it looks like you're not going to be entering a permanent

5    appearance, if you could just notify us, I'll bring Mr. Foster

6    back at that point and we'll get him a lawyer so that on the 9th

7    or whatever that date might be, we can actually proceed with the

8    arraignment and start the speedy trial clock and start the case

9    moving forward.

10          MR. HOWARD:  Absolutely, Judge.  Thank you.

11          THE COURT:  I hope he can retain you.  Mr. Foster, I

12    will tell you Mr. Howard and I have known each other for a

13    while, he's an excellent lawyer, so I hope you can afford to

14    retain him.

15          All right.  What about -- Mr. Howard, what is your

16    pleasure as far as a pretrial detention hearing?  Is Mr. Foster

17    ready to proceed today or do you need some more time to prepare?

18          MR. HOWARD:  We're prepared to go forward.

19          THE COURT:  All right.  Is the Government ready to

20    proceed today?

21          MS. DUANE:  Yes, Your Honor.

22          THE COURT:  Okay.  Great.  I would note the Government

23    did file under seal, at least one that I saw, victim letter

24    which I've granted the motion to seal that.  And Mr. Howard,

25    have you been provided a copy with the document that was filed

1  under seal?

2          MR. HOWARD:  I have seen the letter, Your Honor.  I

3  have issues with its relevance, but that's for another time.

4          THE COURT:  You can certainly argue that as we go

5  through the hearing today, but I just wanted to make sure

6  everybody had what had been filed.

7          MR. HOWARD:  Sure.

8          THE COURT:  Okay.  Great.  All right.

9          Well, with that, let me then turn to the Government.  I

10  have reviewed the criminal complaint in this matter which I

11  signed.  I have reviewed the Pretrial Services Report which

12  includes Mr. Foster's criminal history, and I have reviewed the

13  victim letter that was submitted under seal so you don't need to

14  repeat all that.  But if there's any other evidence that the

15  Government would like to either introduce by way of proffer or

16  by way of testimony, I'd be happy to hear it at this time.

17  Excuse me.

18          You're proceeding under risk of flight, danger or both,

19  Ms. Duane?

20          MS. DUANE:  Both, Your Honor.

21          THE COURT:  Okay.  Thank you.

22          MS. DUANE:  Yes, Your Honor.  And Special Agent Kelly

23  Cavey from the FBI is present today to testify.

24          THE COURT:  Okay.

25          MS. DUANE:  The Defendant here, as you know, has been

1   charged with three counts in the complaint:  Conspiracy to

2   commit sex trafficking in violation of Title 18 United States

3   Code Section 1594, which carries a statutory maximum of life, as

4   well as sex trafficking of a minor or by force, threats of

5   force, fraud or coercion in violation of 18 United States Code

6   1591.  That charge, Your Honor, carries a 15 year mandatory

7   minimum and a statutory maximum of life as well.  And finally,

8   the interstate transportation for purposes of prostitution and

9   that has a statutory maximum of ten years.

10         Your Honor, I would note at the outset that this is a

11  case where there is a presumption of detention actually under

12  two different provisions of the statute:  Under 18 USC

13  3142(e)(3)(d), and under the (e)(3)(e) based on the nature of

14  the conduct here.

15         Your Honor, the Government is seeking detention based

16  on the fact that this Defendant is a sex trafficker.  He

17  recruits vulnerable females, including girls that are in foster

18  care and girls that are struggling with addiction to live with,

19  have sex with him, work at exotic dance clubs, engage in

20  prostitution and turn over their earnings to him.  The Defendant

21  promises these women that the money they are making every night

22  for having sex for money will be invested to businesses that

23  will allow them to retire early.  He refers to these women as a

24  family or a team, and he exploits them.  He uses force, threats

25  of force, lies and coercion to keep them in line and to keep

1    them working for his benefit.

2            Specifically Your Honor, as set out in the complaint,

3    Victim One was recruited by Foster, out of the foster care

4    system, when she was 17 years old in 2007.  Foster promised

5    Victim One that he would pay for her high school diploma, her

6    cellphone, a car, and offered her a place in his house where she

7    could live and run errands and clean the house.  The night that

8    the victim met -- Victim One, rather, met with the Defendant as

9    a minor, she had sex with him and she subsequently moved into

10   his house.  The Defendant got her a fake identification card and

11   had Victim One start working in strip clubs and engaging in

12   commercial sex as a minor, which continued as an adult.

13           Victim Two was also recruited by the Defendant in 2004

14   when she was 17 years old.  She had run away from home and was

15   kidnapped by a violent pimp who forced her to work at a strip

16   club in Miami as a minor.  On one of the nights when she was

17   working at that strip club as a minor, she was approached by

18   somebody who took her to meet with the Defendant.  The Defendant

19   again promised her a lavish lifestyle, promised her that he was

20   going to help her out, and Victim Two went to live with the

21   Defendant that night and had sex with him as a minor.  She also

22   subsequently engaged in commercial sex at the Defendant's

23   direction.

24           Victim One and Victim Two both reported that the

25   Defendant knowingly trafficked minors as part of his effort to

1    profit from this commercial sex scheme.  Victim One specifically

2    reported that while she was working for the Defendant, he told

3    her that the best places to recruit victims were -- or to

4    recruit girls to work for his organization were group homes,

5    shelters, exotic dance venues, including low-end exotic dance

6    venues, where these women may have violent pimps and may be

7    mistreated and they would be vulnerable and in need of help, and

8    that is when the Defendant would step in and offer to help them

9    but actually exploit them.

10          Based on the reporting of Victim One and Victim Two who

11   were collectively with the Defendant from 2004 to 2011, the

12   Defendant had multiple females, five to 15, that lived with him

13   and worked for him as prostitutes.  He put these girls on diets,

14   he arranged for cosmetic surgeries and he groomed these females

15   and taught them how to go to the strip clubs, to target wealthy

16   men that they could turn into prostitution clients, and he also

17   introduced these girls to men outside of the strip clubs that he

18   knew who they then engaged in sex for money with.

19          Each night these girls, after coming home from working

20   at these exotic dance venues and engaging in prostitution, would

21   have to turn over their earnings to the Defendant or to girls

22   delegated to collect the money, his main girls, on their behalf.

23   Again, the Defendant told these girls that the earnings that

24   they were making nightly would be used to invest in their

25   future, that it would allow them to retire early, but they could

1   only receive these benefits if they stayed with the Defendant,

2   if they stayed with him and continued to engage in prostitution

3   on his behalf.

4          Victim One and Victim Two also reported a coercive

5   environment where Foster tracked their movements, monitored

6   their contacts, kept tabs on them, and both victims also

7   reported incidents of violence at the residence where they lived

8   with the Defendant.  Victim Two specifically reported that on

9   one occasion when she tried to leave, the Defendant he hit her.

10          Victim One and Victim Two also reported that they

11   traveled to various locations at the Defendant's direction to

12   engage in commercial sex to New York, to New Jersey, to Las

13   Vegas, and they would really go wherever the Defendant thought

14   that these girls would make the most money.  Would he direct

15   their travel.

16          Ultimately Victim One left the Defendant in May of

17   2010, and Victim Two left the Defendant in or around October of

18   2011.  Victim Two actually returned to the Defendant at some

19   point in 2014 to 2016 and saw that the same patterns and

20   routines were in place at the Defendant's residence; that he had

21   main girls who were collecting the earnings from the other girls

22   who were living there on a nightly basis.

23          Most recently, Your Honor, on September 6, 2019, an

24   adult female who is referred to in the complaint as Victim Three

25   called the Human Trafficking Hotline requesting emergency

1    extraction from a hotel in Michigan.  Victim Three was recruited

2    by one of Foster's main girls in mid-August.  Victim Three again

3    was told that she would make money through investments and moved

4    into one of the houses associated with the Defendant in Delray

5    Beach after being introduced to and having sex with the

6    Defendant.  Victim Three is in recovery for drug addiction.  The

7    Defendant told Victim Three that he would help her out, that he

8    would get her back on her feet.  After Victim Three moved into

9    the house, she was put on a diet and told that she could only

10   get cosmetic surgeries that the Defendant promised if she lost

11   weight.

12        While Victim Three resided with the Defendant and his

13   organization, the other girls working for the Defendant engaged

14   in commercial sex at the strip clubs in South Florida.  Victim

15   Three reported that they pooled their money to invest in

16   businesses, which is consistent with the reporting of Victim One

17   and Victim Two.

18        In early September, around the time of Hurricane

19   Dorian, the Defendant directed Victim Three and six other

20   females to travel from Fort Lauderdale to Detroit, Michigan

21   because of this hurricane.  He believed they wouldn't make money

22   if they stayed in Miami.  One of those -- one of Foster's main

23   girls actually, Hanah Chan, who probation recommends as a

24   co-signer on the Defendant's bond, bought Victim Three's ticket,

25   and Foster and Chan dropped Victim Three and other girls off at

1    the airport for this flight.

2              When Victim Three got to Detroit, she was told that she

3    would also have to engage in commercial sex in order to make

4    money.  She had previously believed that she would only have to

5    dance.  Foster told her in a phone call that she would have to

6    engage in sex for money with clients.  Victim Three reported

7    that each night the girls turned over their earnings so that

8    they can make a financial goal in order to return to Miami.

9    Victim Three did not want to engage in commercial sex, and she

10   did not feel free to leave, so she called the national

11   trafficking hotline and was rescued by law enforcement.

12             When law enforcement went to retrieve Victim Three's

13   belongings from the hotel room in Michigan, law enforcement

14   found a notebook with notes indicative of prostitution, and that

15   notebook was subsequently recovered by law enforcement during

16   the search warrants that were executed at the three residences

17   last week.  During the execution of the three search warrants,

18   law enforcement also found evidence consistent with the

19   reporting of the victims including large quantities of condoms,

20   clothing for exotic dancing and a money counter.  There were

21   also approximately six females found in the residences.

22             Additionally Your Honor, more recently, law enforcement

23   found the Defendant's website FostersCareInc.com, which advises

24   free services including housing, therapy, medical treatment and

25   job training for victims of sex trafficking.  The website

1    reports that its program for sex trafficking was started in 2008

2    and that it served over 140 women, and provides protection in

3    partnership with the police and the FBI.  That is a lie.  The

4    phone number listed on the website is the Defendant's, and the

5    Defendant, in the Defendant's post-*Miranda* statement, admitted

6    to having the website designed on his behalf.  The website

7    appears to be a clear effort by the Defendant to recruit new

8    victims.

9           This website is also a continuation of a corporation

10   named Foster's Care that the Defendant incorporated in November

11   2014 as a not-for-profit organization.  That organization was

12   supposed to provide social services, counseling and shelter to

13   the youth and young adults.  Foster was listed as the

14   incorporator and president of the Foster's Care Corporation.

15   Also on the corporate documents were the Defendant's main girls,

16   one of which is Hanah Chan who again, Probation recommends as a

17   co-signer.  She is listed as the chief financial officer of

18   Foster's Care.

19          Your Honor, I would also point out that the Defendant

20   has access to funds kept in bank accounts not only in his name,

21   but in his main girls' names and in business accounts.  Some of

22   those businesses are outlined in the Presentence Investigation

23   Report, but law enforcement has identified many more in the

24   names of his main girls and other girls within his organization.

25          Additionally, Your Honor, with regard to flight, law

1    enforcement recently learned of an investigation by Homeland
2    Security Investigations into an individual that was altering and
3    selling passports from other countries.  These countries
4    included Romania, Italy and Ireland, as well as counterfeit
5    driver's licenses and identity cards.  In March of 2019,
6    Homeland Security Investigations detained multiple electronic
7    devices in connection with this investigation from a suspect,
8    and when those electronic devices were searched, law enforcement
9    found what appears to be a passport photograph of the Defendant
10   that was uploaded in December of 2018.  That case is ongoing,
11   but I mention it only because it's relevant to the fraud
12   analysis that the Defendant's photograph was found on a suspect
13   who counterfeiting fraudulent documents.

14          Finally Your Honor, this is a victim crime.  These
15   victims have a real fear of the Defendant and a very real fear
16   for their safety if the Defendant is released.  As you pointed
17   out, the Government did submit a letter under seal from one of
18   those victims.  Since the Defendant's arrest, we would point out
19   that we have received additional phone calls from females
20   identifying themselves as victims of the Defendant.  We have
21   also received information that the Defendant is reaching out to
22   victims through people within his organization.  The victims
23   that law enforcement has identified have a very real fear of
24   this Defendant, of his main girls and of his other associates,
25   and they do feel that their lives are threatened.

1          That concludes the factual proffer.

2          THE COURT:  Thank you very much.  I'm sorry.

3          Mr. Howard, would you like to cross-examine the agent?

4          MR. HOWARD:  I would, sir.

5          THE COURT:  All right.  If the agent can come forward

6     please and be sworn.

7          MS. DUANE:  Yes, Your Honor, the Government calls

8     Special Agent Kelly Cavey.

9          THE COURT:  Agent Cavey.

10         COURTROOM DEPUTY:  Please raise your right hand.  Do

11    you swear the testimony you're about to make before this Court

12    shall be the truth, the whole truth and nothing but the truth so

13    help you God.

14         THE WITNESS:  I do.

15         COURTROOM DEPUTY:  Please state your full name, spell

16    your last name for the record.  The microphone.

17         THE WITNESS:  Okay.  My first name is Kelly with a Y.

18    Last name is spelled C as in cat, A, V as in Victor, E-Y.

19         THE COURT:  Mr. Howard, whenever you're ready, you may

20    inquire.

21         MR. HOWARD:  Thank you, Your Honor.

22                        CROSS-EXAMINATION

23    BY MR. HOWARD:

24    Q.  Good afternoon, ma'am.  How are you?

25    A.  Good afternoon, sir.  I'm good.  Thank you.

1    Q.  Your complaint in this case begins by referencing in

2    paragraphs five and six some complaints that were -- or

3    allegations that were made in February of 2017 and June of 2017.

4    A.  Yes.

5    Q.  You have a copy before you or are you going to need one?

6    A.  I do not have a copy before me.

7             MS. DUANE:  I have an extra copy.

8        BY MR. HOWARD:

9    Q.  With respect to the February 2017 allegation, were you the

10   person to whom it was made, or were you otherwise associated

11   with any investigation concerning that allegation?

12   A.  I was not present during the initial February 2017

13   reporting, but I have been involved in the case after that point

14   and I'm aware of the initial allegation.

15   Q.  When you say "after that point", you mean beginning when?

16   A.  I would say shortly thereafter, within the next couple

17   months thereafter.

18   Q.  Okay.  Because there is a second allegation in June of 2017.

19   My question is between -- after February 2017 but before June

20   2017, was there an investigation conducted into -- to determine

21   the veracity of the February 2017 allegations?

22   A.  Yes.

23   Q.  And did it undercover any evidence that corroborated the

24   February 2017 allegations?

25   A.  Yes.

1    Q.  What was that?

2    A.  It began with starting to identify the individuals that the

3    victim of 2017 or the Victim One had identified in the initial

4    interview, and that would be the beginning of the corroboration.

5    Q.  Okay.  So you corroborated that there was actually a person

6    named William Foster that existed?

7    A.  Right.

8    Q.  Okay.  Beyond that, what did you do or what evidence did you

9    uncover that confirmed the veracity of the February 2017

10   allegations, before June 2017?

11       MS. DUANE:  Your Honor, I would object.  This isn't a

12   discovery conference and this has been a long-term

13   investigation.  To ask Special Agent Cavey to list off all of

14   the steps that she's taken since then to now corroborate these

15   victims is unfair to her, frankly.

16       THE COURT:  Overruled.  The Government is relying on

17   the weight of the evidence, the defense is allowed to probe the

18   weight of the evidence.

19       THE WITNESS:  I'm sorry.  Can you repeat your question?

20   BY MR. HOWARD:

21   Q.  Prior to June of 2017?

22   A.  Uh-huh.

23   Q.  You said that your investigation into the February 2017

24   allegations confirmed that there was somebody named William

25   Foster.

1    A.  Yes.

2    Q.  What else did your investigation uncover that established

3    the veracity of the February 2017 allegations.

4    A.  The investigation continued by identifying other individuals

5    that Victim One had identified as associates in that

6    organization, as well as identifying the addresses that the

7    victim had associated with the Defendant.  I know we then

8    started to collect documents and to identify through other means

9    ways to corroborate the story.  I do not know and would have to

10   look at my records to know if those requests for documents were

11   submitted between my joining the case shortly after February '17

12   and before June of '17.  I just -- I can't speak to the exact

13   timing on when some of those requests were *(inaudible)*.

14   Q.  Okay.  So prior to June of 2017, you identified other

15   alleged victims?  Is that what you're saying?

16   A.  Yes.

17   Q.  Okay.  And when you say you identified them, you mean you

18   were able to verify that they too existed as individuals on

19   Planet Earth, or you were able to talk to them and verify,

20   corroborate what was told to you by the person who spoke to you

21   in February of 2017.

22   A.  We were able to identify other individuals that Victim One

23   had named as her knowing.  I do not know what extent the

24   corroboration happened between the couple of months between --

25   the couple of months of me joining the case and June of 2017.

1    Q.  Okay.  So is it fair to summarize that the investigation

2    that you were engaged in, between February 2017 and June of

3    2017, revealed to you that William Foster is a real person and

4    that some other people that the person you described as Victim

5    One identified are also real people.  But as you sit there, you

6    cannot attest to any other corroborative evidence that was

7    discovered during that period of time; would that be fair?

8    A.  During that couple months' period, I cannot confidently say

9    for certainty on the record that I know exactly what information

10   we ascertained, say, in May of 2017 as opposed to July of 2017,

11   no.  I would need to consult with all the records.

12   Q.  Okay.  Did you prepare for this examination or --

13   A.  I did, sir.

14   Q.  Okay.  And tell me what you did to prepare.  Did you go back

15   and look through your records as to the substance or the reports

16   that concern the allegations that are made in the complaint?

17   A.  I did, sir.

18   Q.  Okay.  So notwithstanding the fact that you prepared by

19   consulting your records, as you sit there you can't tell me,

20   prior to June of 2017, that you discovered any information that

21   corroborated the truthfulness of the person you described as

22   Victim One's allegations.  That's fair?

23   A.  No, I disagree.  I would say that we were able to -- based

24   on the information she gave us, we were able to identify that

25   the people she talked about were in fact people, and we were

1    able to link them to addresses known to the Defendant.

2    Q.   Okay.  So when you talked to them, what did they say?

3    A.   Talked to who?  I'm sorry.

4    Q.   These people you identified.

5    A.   We did not speak to those individuals during the period of

6    -- during that two month period.  Two, three, four month range.

7              THE COURT:  Mr. Howard, I think what the witness is

8    struggling with is trying to make sure you've cabined the time

9    period as February to June, and I think she's made clear that

10   she's uncomfortable saying she did something in May as opposed

11   to July as opposed to August.  But I think she said she has a

12   general recollection of doing things during 2017 in the spring

13   and summer.  Is that a fair assessment, Special Agent?

14             THE WITNESS:  Yes, Your Honor.

15        BY MR. HOWARD:

16   Q.   Okay.  Well, let's loosen the time constraints a little bit

17   and just limit it to the year of 2017.  You got another

18   allegation in June of 2017, correct?

19   A.   Correct.

20   Q.   And you then expanded your investigation to attempt to

21   further corroborate the veracity of the allegations made in

22   2017?

23   A.   Yes.

24   Q.   And what did you discover?

25   A.   We discovered that -- we were able to identify documents

1    that are consistent with the statements they made.

2    Q.   What documents?

3            THE COURT:  Hold on.  Had you finished your answer?

4    I'm sorry.  He asked you what you had done and you said you

5    found documents.  What else, if anything, did you need to answer

6    that question fully?  I think the question was during -- you had

7    received allegations in June and February, and I think the

8    question that I want to make sure you had a full chance to

9    answer is:  what were you able to do during 2017 to corroborate

10   those allegations, and specifically what other evidence did you

11   uncover.  So categorically, whatever evidence.  You know, did

12   you find documents, did you talk to people, what else did you

13   do?

14           THE WITNESS:  My primary focus was identifying

15   documents and records.  For instance, business records, pharmacy

16   records, records that would be in like the databases, the driver

17   -- the driver license databases to corroborate.  So for

18   instance, if a victim says that she is residing with Mr. Foster

19   at this location, we can see that her address in fact was used

20   on a driver license at that location.  If she says that she was

21   placed on prescription medication, we can get records that show

22   she was in fact placed on the prescription medication that she

23   indeed had said.

24           BY MR. HOWARD:

25   Q.   Okay.  So you were able to in 2017 -- in response to my

1    inquiry as to the breadth and scope of your investigation, you

2    were able to determine that certain people lived at certain

3    addresses, and you were able to determine that certain people

4    were prescribed certain medication.  Correct?

5    A.  Correct.

6    Q.  Did you go beyond that?

7    A.  Yes.

8    Q.  And what did you do?

9    A.  We requested additional records to further support the

10   allegations that they made during their interviews.

11   Q.  And what was that?

12   A.  We also requested, for instance, reporting from Victim One's

13   foster care records to corroborate that she was in fact in

14   foster care.

15   Q.  Okay.  So what you were doing is you are corroborating that

16   Mr. William Foster exists, and you're corroborating with people

17   lived; you corroborated where the person you described as Victim

18   One, whether she had actually been in foster care and you

19   corroborated medication.

20        Did it occur to you at any time to talk to any of these

21   young ladies that you have identified as other victims?

22   A.  Beyond the two victims in this complaint?

23   Q.  Did it occur to you to speak to any of the other people that

24   you identified?

25   A.  It did occur to me.

1   Q.  And did you follow through with that idea?

2   A.  No sir, I didn't.

3   Q.  Why not?

4   A.  Because we had been told through victim reporting that some

5   of the victims remain loyal to him to a degree; that he's had a

6   high degree of psychological manipulation that he's imposed on

7   them.  That he makes them believe that they need him and that

8   some of the victims do remain loyal to him.  It was our concern

9   that they would then alert him to the investigation before we

10   were ready to proceed.

11   Q.  Okay.  So essentially you did not attempt to corroborate

12   victim -- the person you have described as Victim One and the

13   person you described as Victim Two, you didn't attempt to

14   corroborate their allegations as to the actual criminal conduct

15   they referenced because you believed that the people you talked

16   to would not corroborate that information because they were

17   under psychological influence.  Is that fair?

18        THE COURT:  That's not a fair question.  That's a

19   multiple compound question.  I mean, I'm the finder of fact, I

20   heard what she said.  I don't need you to summarize it.  I know

21   what she said.

22        MR. HOWARD:  Okay.  Okay.

23   BY MR. HOWARD:

24   Q.  So outside of verifying where people lived and their

25   prescriptions and their existence, there was nothing -- and

1    foster care residence of the person you describe as Victim One,

2    there was nothing else done in the year of 2017 that you can

3    recall as you sit there.  Would that be fair?

4    A.  Through the course of the investigation, whether it's 2017,

5    2018, 2019, the information we received from the victims,

6    including Victim One, Victim Two and Victim Three, we had made

7    an effort to corroborate to whatever extent they had made a

8    statement.  Whether it be she was in foster care like I had

9    said; whether it be that they be on prescription medication.

10   Any information that we have whether it be flight records; they

11   indicated that they traveled, we requested flight records.  To

12   the extent that they made any statements that could be

13   documented or recorded somewhere, we reached out to those

14   individuals and requested those documents to the extent that we

15   could or were able to, and we continue to do so.

16   Q.  Okay.  So you weren't able to corroborate any of the actual

17   alleged criminal activity, just surrounding facts that were

18   innocent facts.

19           MS. DUANE:  Objection, Your Honor.  Argumentative.

20           THE COURT:  Sustained.

21      BY MR. HOWARD:

22   Q.  Did you corroborate any of the alleged criminal activity

23   itself; yes or no?

24           THE COURT:  If you can answer it yes or no.

25           THE WITNESS:  We have obtained police reports.  So in

1    addition to the travel records, corroborating the individual

2    statements, we also obtained police reports that have reporting

3    that's consistent with the reportings of Victim One and Victim

4    Two.

5         BY MR. HOWARD:

6    Q.   In what way?

7    A.   For example, there was a police report that said that they

8    had traveled to Las Vegas.  No.  Correction.  We have police

9    reports of calls made to DCF that show that DCF workers were

10   notified of possible human trafficking at the different

11   addresses in Florida.  We have reports that the police responded

12   to assist with those investigations.

13   Q.   And that those -- were you able to determine whether the

14   police responded to these locations where these allegations were

15   made actually took any action?

16   A.   We conducted multiple interviews with people, but there was

17   no charges brought.

18   Q.   No charges were brought?

19   A.   To my knowledge.

20   Q.   Okay.

21   A.   We also have reporting from earlier in which the Defendant

22   was charged with from the New Jersey or New York area where he

23   was charged with endangering the welfare of children earlier in

24   1990 -- in the 90s.

25   Q.   And you determined that to be relevant to your investigation

1    in some way?

2    A.   Because there was additional reporting related to that that

3    the Defendant was having minors engage in prostitution at the

4    strip clubs and profiting from that, and there was photographs

5    found of those victims in his possession.

6    Q.   Okay.  And this is concerning an allegation in the --

7    allegation in the year 1993 you said?

8    A.   No.  No, it's -- I would say it's in the later half of the

9    1990s.

10   Q.   Okay.  All right.  1998 actually.  I'm sorry.  In New

11   Jersey?

12   A.   Yes.

13   Q.   And you're saying that the allegation there was relevant to

14   your investigation because it determined -- we're talking about

15   the case that was dismissed against him?  Are you talking about

16   that case?

17   A.   Yes.

18   Q.   Okay.  Did you determine why it was dismissed?  I mean,

19   these are pretty egregious allegations.  It was dismissed

20   because there was no evidence to substantiate?

21   A.   I don't have any information as to why it was dismissed in

22   that court.

23   Q.   Okay.  Now, Victim One claimed that Mr. William Foster

24   obtained a false identification for her because she was a minor.

25   You were able to corroborate that of course.

```
1    A.  Yes.

2    Q.  Okay.  You were able to corroborate the existence of a false

3    ID?

4    A.  Yes.

5    Q.  And you were able to corroborate the fact that Mr. Foster is

6    the one that obtained it?  That would be no?

7    A.  We have the victim saying that she -- he assisted in

8    obtaining it.

9    Q.  So in other words, it's uncorroborated.  This is her word,

10   right?

11            MS. DUANE:  Objection, Your Honor.  Argumentative.

12            THE COURT:  Sustained.

13       BY MR. HOWARD:

14   Q.  Okay.  Beyond the fact that she said that's where she got it

15   from, you have no other information to corroborate the fact that

16   she alleged that Mr. William Foster obtained that.

17            MS. DUANE:  Objection.  I'm sorry, David.  I didn't

18   mean to cut you off.

19            MR. HOWARD:  Go ahead.

20            MS. DUANE:  Objection, Your Honor.  Argumentative.

21            THE COURT:  She's testified that the only evidence is

22   that the victim said that -- that she did not have any

23   independent evidence that Mr. Foster had obtained it, that the

24   victim said so and that's what she's relying upon.

25            MR. HOWARD:  Thank you, Your Honor.
```

1       BY MR. HOWARD:

2   Q.   And the same with respect to the person that you've

3   described as Victim Number 2, you have identified the existence

4   of a false ID for her as well?

5   A.   No, we are still attempting to locate it.

6   Q.   How long have you been trying?

7   A.   Since June of 2017 when she reported it.

8   Q.   Okay.  In Paragraph 7 of the complaint, it indicates that

9   Mr. Foster was alleged to have recruited minors and young women

10  from group homes, and what have you, and from low-end exotic

11  dancing venues.  And you told me you never talked to any of the

12  other people you identified outside of those who made complaints

13  to you during that period of time.  Were you able to establish

14  the veracity of that allegation at all, or were you just relying

15  essentially on what was told to you by these people?  The people

16  you've described as Victims One and Two.

17          THE COURT:  I'm sorry.  If I understand your question,

18  Mr. Howard, you're asking her other than Victim One and Victim

19  Two has she been able to obtain other evidence to support the

20  allegation in Paragraph 7 relating to recruiting from group

21  homes, shelters, et cetera.

22          MR. HOWARD:  You said it a lot better than I did.

23  Thank you.

24          THE COURT:  I don't know that I did.

25          MR. HOWARD:  That is the essence of my inquiry.

1          THE COURT:  Okay.  So Special Agent Cavey, if you

2    understand that question and you can answer it, please answer

3    it.

4          THE WITNESS:  And I need to clarify because I think

5    when we said we hadn't spoken to any victims at all, we were

6    talking about the period that was very narrow between 2017 and

7    June of 2017.  So my joining the case a few months after we're

8    talking about that period.  We have talked to since -- not me

9    personally -- but we have talked to my -- the other agents

10   working in partnership with me on this case have talked to other

11   individuals outside of this, including the individuals that the

12   AUSA -- other individuals have come forward and the case agents

13   in this case have spoken with, and I have spoken with other

14   individuals after the 2017 time frame we discussed.

15        BY MR. HOWARD:

16   Q.   Okay.  Go ahead.  I'm sorry.

17   A.   Okay.  Then to follow-up -- what was your question.  I

18   wanted to clarify before we got into the actual question.

19   Q.   Okay.  So would it be fair to say --

20        THE COURT:  I think the question that was pending was

21   -- and Mr. Howard, I'll let you go to the next one but I want to

22   make sure to answer that question -- in Paragraph 7 there's an

23   allegation made that Mr. Foster recruited minors and young women

24   from group homes, shelters, exotic dance venues.  Do you see

25   that in Paragraph 7?

```
1           THE WITNESS:  Yes, Your Honor.

2           THE COURT:  I believe Mr. Howard's question -- and I'll

3    let you modify this if I get it wrong Mr. Howard -- is,

4    forgetting time frames, from 2017 to the present, what evidence

5    have you uncovered to corroborate those allegations other than

6    what Victim One and Victim Two say?

7           THE WITNESS:  We had spoken with other victims in this

8    case that do corroborate and provide additional evidence for

9    that.

10      BY MR. HOWARD:

11   Q.   Could you give us a time frame for that?  Approximate?

12          THE COURT:  I'm sorry, Mr. Howard.  Time frame from

13   when she spoke to them or time frame from when they claim they

14   have personal knowledge?

15          MR. HOWARD:  Time frame from when she spoke to them or

16   one of your fellow agents spoke to them.

17          THE WITNESS:  I would have to look at the report for

18   the time frame.  I don't want to misspeak in court.

19      BY MR. HOWARD:

20   Q.   You can approximate.

21   A.   2000 -- for sure this year, and into 2018 possibly.  I'd

22   have to refer to my notes to ascertain that.

23   Q.   And these were people who came forward, the ones we're

24   describing here, are people who came forward or people that you

25   were able to find?
```

1    A.   People that came forward, yes.

2    Q.   You were able to -- Paragraph 8 indicates that victim -- the

3    person you have described as Victim Two alleges that she was

4    recruited out of Gold Rush in Miami 2004.  Were you able to

5    corroborate that?

6    A.   No, not yet, sir.

7    Q.   You could go down to Gold Rush and ask.  It's been a couple

8    of years.  You didn't do that yet?

9    A.   Not yet, sir.

10   Q.   Okay.  Now, in Paragraph 9 there is reference made to

11   prostitutes and/or sex trafficking victims.  Could you explain

12   the distinction that you're making there.

13   A.   The distinction would be that the sex trafficking victims

14   have indicated that there was a degree of force, fraud or

15   coercion or that they were minors at the time as opposed to

16   individuals that we know just to have been engaging in sex acts

17   in exchange for money.

18   Q.   Okay.  So in paragraph -- because Paragraph 9 is referring

19   to an allegation made by both Victims One and Two?

20   A.   Uh-huh.

21   Q.   And indicates that at any given time, approximately five to

22   15 females lived with and worked for Mr. Foster, and you

23   described them as both prostitutes and/or sex trafficking

24   victims.  So it's your understanding that some of the people

25   there were doing it of their own volition and they were not

1    minors?

2    A.   I'm sorry.  What was the question again?

3    Q.   Paragraph 9 reads as follows:  Based on reporting from

4    Victim One and Victim Two, at any given time approximately five

5    to 15 females lived with and worked for as prostitutes and/or

6    sex trafficking victims.  You had indicated that the distinction

7    between the two is sex trafficking victims are either minors or

8    people who are being forced into the life, and prostitutes are

9    people doing it of their own volition.  And so your

10   understanding is that among the five to 15 people that Victims

11   One and Two described, some were doing it voluntarily and some

12   were not?  Was that your understanding of the scenario of what

13   was transpiring?

14   A.   We know from the victims that there were some that came in

15   for a short period of time and left very quickly thereafter.  So

16   for them to be able to speak, they didn't recall a lot of the

17   information about those individuals because they were there so

18   quickly and could not necessarily speak and provide us with

19   information of those females that worked with him beyond the

20   fact that they engaged in prostitution.

21   Q.   Okay.  So what you are saying is the reason that you made

22   that distinction in Paragraph 9 is because you wanted to capture

23   also the people who were there for a short period of time.  The

24   term "prostitutes" there only refer to people who were there for

25   a short period of time?  Is that what you're saying?

1   A.   No, that would encompass females that we did not have

2   specific evidence that they had been fraudulently in there,

3   coerced, forced into that specific information because the

4   victims did not -- weren't able to provide specific examples or

5   anything specific related to those individuals other than that

6   there were females that stayed for a short period of time at the

7   residence as part of that organization.

8   Q.   Okay.  So in other words, everybody except Victim One and

9   Victim Two, because they're the only ones you had spoken to, and

10  you were saying that you couldn't speak to the circumstance

11  involving all the rest who you chose not to speak to?

12  A.   No, I think it would also encompass the individuals that the

13  victims described that had been beaten by Foster or sodomized by

14  Foster, and it would encompass those type of acts as well.

15  Q.   Sodomized.  There was nothing in the complaint about sodomy.

16  Are you saying that that occurred or that is an allegation that

17  was made that you chose not to put in your affidavit?

18  A.   That was information we received from one of the victims,

19  yes.

20  Q.   That's information that you -- which victim told you that?

21  Which alleged victim?

22  A.   I would have to look at my report to know which victim said

23  that.

24  Q.   Are you sure that occurred though?

25  A.   Yes.

1    Q.   Okay.  Now, there is discussion in Paragraph 11 about young

2    ladies dieting and cosmetic surgery and receiving or being

3    subjected to cosmetic surgery.  Were you made to understand that

4    the women that were there dieting were dieting against their

5    will?  Is that what you're trying to allege?  They're being made

6    to diet?

7    A.   My understanding is that Mr. Foster creates a very

8    manipulative and psychologically coercive environment in which

9    the females have a high degree of pressure to be attractive and

10   to be able to be attractive to high-end clients, and there was a

11   lot of pressure on appearance and a lot of competition within

12   the house to look a certain way.  Mr. Foster has a way that he

13   wants the females in his house to look, and part of that

14   includes being skinny.

15   Q.   Okay.  Sounds like society in general is that kind of

16   pressure.  But my question to you is what were you told with

17   regard to what Mr. Foster actually did that made somebody diet

18   against their will or out of psychological pressure.  What were

19   you told he did?

20   A.   That when they entered the house, if they weren't of the

21   weight he desired, that he put them on the lemon diet.

22   Q.   Were they free to leave or no?

23   A.   If you're asking if there were chains on the -- if they were

24   chained up --

25   Q.   That's not what I'm asking.  I'm asking --

1    THE COURT:  No, no, that's what you asked.  She can

2    answer the question.

3    THE WITNESS:  I can tell you that the victims -- we did

4    not have any reporting that the victims were chained up, that

5    there were bars on the windows or that the doors were locked and

6    that they couldn't leave the doors.  But what I can tell you is

7    that physical restraint is not the only method or means that

8    human traffickers use to control their victims.  They also use

9    psychological coercion, psychological manipulation, restraint of

10   finances as the victims have reported to us all the money they

11   gave -- these victims sold their bodies, and all the money they

12   gave they told was being invested into businesses and if they're

13   to leave, they were told they would leave with nothing.  And all

14   this was done in addition and in conjunction with the fact that

15   Mr. Foster also has them take different types of psychiatric

16   medication.

17   So though there's not bars on the windows, they're not

18   in chains, whether they perceived that they were free to leave

19   or had the ability to leave, many did not under those

20   circumstances and they did not -- the psychological manipulation

21   that he employs prevents them from leaving.  For example, he

22   tells them they need them and that they should be scared to

23   leave the world (sic).  In one instance a victim described how a

24   female returned to his house either drunk or intoxicated, and he

25   had all of the girls come out and watch this victim in the

1    backyard and he told them this is what could happen if you leave

2    me.

3        BY MR. HOWARD:

4    Q.   And what was it that he said could happen?  What was --

5    A.   That this victim, you know, he described that her life had

6    fallen apart and now she's in a back yard, drunk and intoxicated

7    and this is what could happen if you leave him.

8    Q.   Okay.  So the psychological -- the psychological

9    manipulation was saying that you need me and if you leave me,

10   you will be -- your life will come to nothing and he was keeping

11   their money essentially.  That was it?  That's what you're

12   describing?

13   A.   In the context that Mr. Foster also recruits vulnerable

14   victims, including minors at age 17 that have very minimal

15   family support system if any, and they're looking for a safe

16   place to go, and he promises them a better life, he promises

17   them, you know, high-end stuff and all these business events and

18   retirement plans and then they leave with nothing.

19   Q.   Okay.  Let me just correct something.  You're saying this is

20   what the victims told you.  This is nothing that you have

21   verified independently has occurred, right?  This is what these

22   people you've described as victims told you?

23   A.   Correct.

24   Q.   Okay.  So when you say Mr. Foster did this and that, you

25   mean to say that Victim One or Victim Two told you that

1   Mr. Foster did this or that.  That's what you mean to say?

2   A.  Yes.

3   Q.  Okay.  So I'm trying to see what your understanding is of

4   the diet, the mandatory diet.  Because when somebody comes in

5   and Mr. Foster says you have to diet and they have not at this

6   point put any money in, they have not at this point either been

7   sufficiently in his presence to be subjected to this

8   psychological manipulation, they decide to go on a diet and

9   you're saying he's forcing them to do that?

10  A.  It was part of the requirements if they wanted to remain in

11  the house.

12  Q.  Okay.  So if they wanted to remain.  Did they tell you why

13  it is they wanted to remain there?  Because at this point,

14  there's no manipulation; at this point, there's no money being

15  taken; at this point, they can look how they want to.  Why were

16  these victims telling you they wanted to stay there such that

17  they would go on a diet?  Surely you asked, right?

18  A.  It's part of the initiation process into the house and it

19  requires a broader understanding and a context.  They come into

20  the house, they're promised these wonderful gifts, they're shown

21  a wonderful wardrobe and it's part of the initiation process,

22  and the pressure to conform to everything that's in the house

23  and to do what Mr. Foster tells them to do.  You have a 17 year

24  old --

25  Q.  Who alleges?

1   A.   -- who was faced with a decision on whether she remains with

2   an abusive pimp that kidnapped her or to go with Mr. Foster that

3   evening to what he promised would be a better location.

4   Q.   Okay.  So you referred to an initiation process and there

5   was no reference to that in the complaint.  Are you saying that

6   you understand that there was some specific initiation process,

7   or is that a phrase that you fashioned for purposes of trying to

8   explain your testimony?

9   A.   I'm sorry.  Can you repeat the question one more time?

10  Q.   Are you saying that there was some formal initiation process

11  or is that something that you have fashioned in an effort to try

12  and explain your understanding of the facts.

13        MS. DUANE:  Objection, Your Honor.  Argumentative.

14        THE COURT:  Sustained.

15     BY MR. HOWARD:

16  Q.   Was there a formal initiation process about which you know?

17  A.   Based on the reportings from Victims One, Two and Three, my

18  understanding is that part of coming into Mr. Foster's household

19  is that they each have to sleep with him that evening and that

20  would be the beginning of it, and then he grooms them to become

21  better in the strip clubs and better able to make money in the

22  strip clubs.  He might not make them enter the strip clubs right

23  away, but he then grooms them and prepares them and takes them

24  to the clubs and educates them how to make more money from

25  clients.

1    Q.  Okay.  Because I noticed you did mention that Mr. Foster --
2    before I get to that, is it your understanding that women were
3    subjected to cosmetic surgery against their will, or is this
4    something they did of their own volition?
5    A.  It's not my understanding that they were held down in any
6    way.  I do not have any information that they did it against
7    their will other than to conform with what was going on in the
8    house.
9          THE COURT:  So you have no evidence there was forcible
10   surgery.
11         THE WITNESS:  Not at this time, no.
12      BY MR. HOWARD:
13   Q.  Okay.  But what you're trying to say is they were
14   manipulated into wanting it is?  What you're trying to say?
15         MS. DUANE:  Objection, Your Honor.  Mischaracterizes
16   her response.
17         THE COURT:  It's argumentative.  I heard the evidence.
18   I understand her testimony.
19         MR. HOWARD:  Okay.
20      BY MR. HOWARD:
21   Q.  Now, there is an indication in Paragraph 12 that Victim One,
22   and I think you just referenced it, said that Mr. Foster
23   allegedly taught the ladies about him how to target wealthy men
24   as prostitution clients.  Did they give you any details or did
25   they just give you this broad allegation?

1    A.   Victim One explained, for example, that he taught them not

2    to look at the guys that were dressed in the flashy wardrobes

3    throwing the cash around, but instead to look at the more

4    reserved men that had the very expensive watches or the

5    expensive brand shoes.

6    Q.   Okay.  So it was Mr. Foster that told these young ladies

7    look at the guy with the Rolex and they didn't know that before?

8    Like the rest of us?

9    A.   I can't speak to what the victim exactly knew about Rolexes

10   before she encountered Mr. Foster, but what I can say is that he

11   helped educate her as to what would be the maximum way to earn

12   money.

13   Q.   Okay.  What you're saying is she said that he helped educate

14   her as to the maximum way to make money, and what you're

15   describing is that she says he told her to look at the guy with

16   the expensive watches and shoes and that's what you're referring

17   to in Paragraph 12?

18            MS. DUANE:  Objection, Your Honor.  Compound question.

19            THE COURT:  Sustained.

20        BY MR. HOWARD:

21   Q.   You're referring to, in Paragraph 12, the instruction and

22   the tutorial that is described in Paragraph 12 with respect to

23   targeting wealthy men as prostitution clients.  Would it be fair

24   to say that it included identifying men with expensive watches?

25            MS. DUANE:  Objection, Your Honor.  Compound question.

```
 1              THE COURT:  It's also been asked and answered.
 2    Sustained.
 3         BY MR. HOWARD:
 4    Q.  Okay.  Well you mentioned watches, you mentioned shoes.  Was
 5    there anything else to the tutorial that you were made aware of?
 6    A.  I also know that the -- Mr. Foster would drive Victim One
 7    around and ask her -- point out individuals on the street and
 8    ask her to read them and give her take on those individuals.
 9    Q.  Okay.  So the other part of the tutorial -- did she give you
10    any other detail than read him and tell me about him?  Like did
11    you ask for any more detail or were you satisfied with that?
12              THE COURT:  Again Mr. Howard, at some point this isn't
13    a discovery deposition.  How she conducted her investigation
14    isn't really germane to me.  What I want to know is if you want
15    to challenge the evidence that they've proffered, go after the
16    evidence, not after the investigation please.
17              MR. HOWARD:  Okay.  Thank you, sir.
18              THE COURT:  Uh-huh.
19         BY MR. HOWARD:
20    Q.  Paragraph 12 also makes reference to yacht parties.  You
21    were able to corroborate information regarding Mr. Foster
22    introducing these young ladies to people on yachts?  You
23    corroborated that?
24    A.  We corroborated the fact that the identities of the people
25    that they were able to associate with those yacht parties are
```

1    people, again, that do exist.

2    Q.  But not that they met them on yachts actually.  But just you

3    corroborate -- so if, for example, Victim One said I met John

4    Doe on a yacht, you were able to corroborate that John Doe

5    exists but not that she met him or that she met him on a yacht.

6    Would that be fair?

7    A.  That's fair.

8    Q.  Regarding women not being able to keep the money they

9    earned, did you uncover any evidence to corroborate that?

10         THE COURT:  I just want to make sure I understand the

11   question.  When you say "corroborate", do you mean did one

12   witness say the same thing as another witness?  Or are you

13   asking for independent documentary or other corroboration?

14         MR. HOWARD:  Sure.  Thank you, Your Honor.

15         THE COURT:  That will help me if I can understand.

16         MR. HOWARD:  Okay.

17   BY MR. HOWARD:

18   Q.  First let's -- beyond Victim One and Two, were there other

19   people who told you that they could not keep the money they

20   earned, they were not free to leave with whatever they learned?

21   A.  Victim Three.

22   Q.  Victim Three?

23   A.  Yes.

24   Q.  Did Victim Three tell you that she made any money and that

25   she was forced to turn it over?

1    A.  Victim Three indicated that the money that they earned while

2    they were in Detroit was turned over to another girl who then

3    deposited it into a bank account.

4    Q.  Okay.  All right.  And this was something that Victim Three

5    said she observed or that she herself did?

6    A.  That she observed.  I have to go back to my report for her

7    to know what she turned over.

8    Q.  Okay.  Now, Victim Two is referenced in Paragraph 14 and a

9    corresponding Footnote 3, and she was saying that she left

10   Mr. Foster at one point; is that correct?

11   A.  I'm sorry.  Where are you looking at?

12   Q.  Paragraph 14.

13   A.  Okay.

14   Q.  Victim -- the person you described as the victim, Victim

15   Number Two, said that she left Mr. Foster and then she returned?

16   A.  Yes.

17   Q.  Okay.  Did she describe whether or not she had any

18   resistance when she attempted to leave, or did she describe her

19   thought process when she decided to return, either?

20        MS. DUANE:  Objection, Your Honor.  This goes beyond

21   the scope of the complaint.

22        THE COURT:  Yeah.  What her thought process was would

23   be beyond the scope.  If she had specific conversations with

24   Mr. Foster, I think that would be germane.  So if you can limit

25   your answer to what, if any, conversations she had with

1    Mr. Foster or other people affiliated with Mr. Foster when she

2    left; in other words, did anyone try to discourage her from

3    leaving, what was she told and when she went back, what if any

4    conversations did she have.  But her general thought process is

5    not -- I'll sustain the objection.

6              MR. HOWARD:  Thank you.

7              THE COURT:  So Agent Cavey, if you can answer that

8    question.

9              THE WITNESS:  The question is -- I'm sorry.  Repeat the

10   question one more time please.

11       BY MR. HOWARD:

12   Q.  What did Victim Number Two -- she said she left Mr. Foster

13   at that time, at some point.  Did she describe any resistance to

14   her leaving?

15             THE COURT:  Victim One or Two?  I thought you asked

16   Victim One the last time.

17             MR. HOWARD:  I think it's Victim Two.

18             THE COURT:  Okay.

19             THE WITNESS:  So with respect to Victim Two, I have to

20   look back at my reports to understand the specific time of

21   leaving.  I know one time Victim Two left, she was hit in the

22   head and did not leave that night.

23       BY MR. HOWARD:

24   Q.  Okay.  Well, we're talking about the time she left.  She

25   told you at one point she attempted to leave and she was hit in

1     the head, we saw that.  Then when she left, she wasn't hit in

2     the head that time or anything else.

3           MS. DUANE:  Object -- I'm sorry.  Go ahead.

4           MR. HOWARD:  She just left?

5           THE COURT:  Again, I'll rephrase Mr. Howard's question.

6           What do you know about the circumstances under which

7     she left?  Maybe it's easier to do it that way.

8           MR. HOWARD:  Thank you.

9           THE WITNESS:  I would have to look at my reports.  I

10    cannot recall at this time the circumstances.

11          THE COURT:  As you sit here today, and I understand you

12    prepared but maybe not in this detail, do you have any

13    recollection as to whether she informed you she was -- anyone

14    physically tried to prevent her from leaving when she left?

15          THE WITNESS:  No, I do not.

16          THE COURT:  Okay.

17    BY MR. HOWARD:

18    Q.  Or psychologically tried to prevent her from leaving when

19    she left?  You don't have that either, do you?

20          MS. DUANE:  Objection, Your Honor.  Argumentative.

21          THE COURT:  Yeah, I'll sustain that.

22          MR. HOWARD:  Your Honor, may I just -- the manipulation

23    and the coercion when I asked about whether they were free to

24    leave.

25          THE COURT:  Okay.  You can ask about what was done, but

```
 1    to ask what her state of mind was, whether she felt

 2    psychologically coerced I think is outside the -- is out of

 3    bounds.  If you want to ask about facts like what happened, then

 4    you can argue from that other inferences.  You can argue to me,

 5    not to the witness.

 6              MR. HOWARD:  Sure.

 7         BY MR. HOWARD:

 8    Q.  So there was no physical -- with respect to Victim Two, you,

 9    as you sit there, do not recall any attempt to stop her when she

10    actually left physically.  Do you recall her alleging any other

11    activity that was designed to prevent or dissuade her from

12    leaving?

13              MS. DUANE:  Objection, Your Honor.  Compound question.

14              THE COURT:  Again, I'll rephrase it this way, Special

15    Agent.  I'm giving you an open-ended -- sort of an open

16    question.  What facts, if any, were relayed to you about when

17    she tried to leave and what was said to her, what was done to

18    her or anything like that when she tried to leave.

19              THE WITNESS:  I know when she left finally in the end

20    of 2011, she explained that she did not leave with any money

21    because she had feared that he would physically retaliate

22    against her if she did.  As I sit here today, I cannot remember

23    from my reports the specific conversations, if any, regarding

24    this -- I'm sorry, Your Honor.  What was the --

25              THE COURT:  Sure.  The complaint states that Victim Two
```

1   left once, came back, left a second time.  And I think what

2   Mr. Howard was trying to explore, and the way I've sort of

3   limited it is, when she tried to leave, was anything said to

4   her, done to her to either directly or indirectly persuade her

5   not to go?

6           THE WITNESS:  I cannot recall anything of that nature

7   at this time.

8       BY MR. HOWARD:

9   Q.  Okay.  And she claims to have -- we're talking about Victim

10  Two, and we're also still in Paragraph 14, that she had full

11  access to the finances but she didn't take it out of fear of

12  physical reprisal?

13  A.  Correct.

14  Q.  She didn't say that physical reprisal was present; she just

15  said she had a fear, correct?

16  A.  Correct.  But Victim Two also explained in detail that she

17  knew and had seen Mr. Foster be physically abusive to other

18  women as well as to herself, and she knew exactly how far she

19  could push him and what not to do to avoid his physical abuse.

20  Q.  Did you put that somewhere in your complaint that I'm

21  missing?

22          MS. DUANE:  Objection, Your Honor.  Argumentative.

23          THE COURT:  Sustained.

24      BY MR. HOWARD:

25  Q.  Okay.  So she had access to the money and didn't take it

1    because of her -- of what she perceived over the time that she

2    was there that caused her to fear physical harm.  Is that what

3    you're saying?

4    A.  Yes.

5    Q.  Okay.  But she can't describe anything that was actually

6    said or done.

7            MS. DUANE:  Objection, Your Honor.  Argumentative.

8            THE COURT:  Sustained.  It's also been asked and

9    answered twice.

10           MR. HOWARD:  Okay.  Thank you, sir.

11           THE COURT:  Uh-huh.

12       BY MR. HOWARD:

13   Q.  Now, there was a claim by Victim One in Paragraph 16 that

14   Mr. Foster was tracking women through e-mails, contacts, social

15   media and online searches, et cetera.  Is it fair to say that

16   you haven't verified that any of that occurred either?

17           THE COURT:  Again, let's be clear.  When you say she

18   hasn't verified it, you mean by independent documentation or by

19   the testimony of witnesses?  The complaint identifies two

20   different people who say it happened.  So one could argue that's

21   corroboration.

22       BY MR. HOWARD:

23   Q.  Sure.  Beyond the statements of the people you described as

24   Victims One and Two, were you able to verify, either by

25   additional witness statements or by documentation of some sort,

1  that the allegation that Mr. Foster was tracking women through

2  e-mails, contacts, social media and online searches actually

3  occurred?

4  A.   Beyond victim reporting, no.

5  Q.   So there were other victims beyond Victim One and Two as

6  well that said that this occurred?

7         MS. DUANE:   Objection, Your Honor.   Argumentative.

8         THE COURT:   I think that would clarify whether she's

9  limiting -- the question is are you limiting -- you said only

10  victim reporting, so I think the question is are you limiting

11  that to Victims One and Two, or did other victims give you

12  similar information?

13         THE WITNESS:   Specific to e-mails, contacts, social

14  media and online search history would be the victim, Victim One.

15  The victims of the complaint.

16         THE COURT:   Okay.

17  BY MR. HOWARD:

18  Q.   Victims One and Two, or you just limited to One?

19  A.   I have to check my reports for Victim Two.   For sure Victim

20  One.

21  Q.   Okay.   All right.   Paragraph 17, there was indication

22  Mr. Foster used deceit, manipulation and fear of physical harm.

23  I take it those were your words and not their words.   Could you

24  tell me the words that they used about deceit and manipulation?

25         Deceit, first of all.   Could you tell us what deceit.

1    THE COURT:  Again, I think she's testified to facts so
2    let stick to facts.
3       BY MR. HOWARD:
4    Q.  Okay.  Could you testify as to the facts that you summarized
5    as Mr. Foster engaging in deceit?
6       MS. DUANE:  Objection, Your Honor, this is -- again, it
7    lays out a statement in the complaint.  He's going beyond the
8    complaint.
9       THE COURT:  I'll allow this.  I think he's allowed to
10   probe whether that statement in the complaint has a factual
11   basis.  So the Special Agent can answer what facts she would say
12   support an allegation in Paragraph 17 that Mr. Foster used
13   deceit.  I'll allow her to answer that.
14      THE WITNESS:  For example, Mr. Foster promised them
15   that all the money that they invested and had earned would be
16   going through business investments and towards a retirement
17   fund, and that the victim would be able to retire early.  The
18   victim did not receive a retirement bonus from her involvement
19   in the organization.
20      BY MR. HOWARD:
21   Q.  Okay.  Because I notice you said Victim One received.  It
22   was Victim One or Two that received a check on her way out the
23   door.
24      MS. DUANE:  Your Honor, that mischaracterizes the
25   complaint.

1          THE COURT:  Okay.  If it does, the officer can -- the

2     Agent can clarify that.  I guess that's the question, Special

3     Agent.  Did Victim One or Two, one of them, receive a check when

4     she left?

5          THE WITNESS:  Yes.  Victim One received a check after

6     leaving Foster in 2010.  Victim One explained that the check she

7     believed was written in her name and it was not of an amount

8     that was consistent with any of the earnings that she had earned

9     for the organization.  She believed it was possibly a check from

10    one of the strip clubs, and she explained in New York, the strip

11    clubs are paid -- the individuals, females in the strip clubs,

12    are paid by check.  New York has different rules than the state

13    of Florida.  So the individuals were paid by check, and she

14    believes that the check may have been issued by one of the strip

15    clubs to her and that that's why he had to turn it over to her

16    because it wasn't in his name.

17         BY MR. HOWARD:

18    Q.  Okay.  Did your investigation uncover whether or not either

19    Victim One or Victim Two purchased a house in her own name

20    exclusively?

21    A.  I believe Victim Two had purchased a house.

22    Q.  Okay.  You mean she purchased it?  I mean, she wasn't able

23    to keep her own money according to you, so it would have to have

24    been Mr. Foster that purchased it for her in her name

25    exclusively.  Is that your understanding?

1    A.  That is my understanding.

2    Q.  Would that be somewhat of the type of retirement that you

3    were talking about?  A house?

4    A.  It was also my understanding that Mr. Foster instructed the

5    victim to stop making payments on the house and to allow the

6    house to go into foreclosure.

7    Q.  Okay.  But she had left him by this time, had she not?  And

8    she has a house in her name and he just told her let it go into

9    foreclosure?  Is that your understanding?

10   A.  It was my understanding that those instructions were given

11   before she left him.

12   Q.  Okay.

13   A.  And that he explained that there was a loophole in the

14   mortgage system that they could maximize.

15   Q.  That what?

16   A.  That they could benefit from.  He explained that he had a

17   loophole in the system that they could somehow profit from

18   through that way.  The victim didn't have a very good

19   understanding of how the loophole worked.

20   Q.  Okay.  All she knew is she owned a house in her own name,

21   right?

22   A.  That Foster had her purchase.  That there was a house in her

23   name, yes.  Or in her business.

24   Q.  And you have reports that detail this loophole stuff you're

25   telling us about, right?

1    A.   I have reports where she discusses a loophole.

2    Q.   Okay.  Now, at the time that Mr. Foster was arrested, I

3    heard during the proffer that there were six young ladies

4    discovered at some residence or another; is that correct?

5    That's associated with Mr. Foster?

6    A.   I believe there have actually been six or more.

7    Q.   Six or more.  And were any of them spoken to, interviewed?

8    A.   They were.

9    Q.   Did any of them corroborate Victims One or Two and claim to

10   be victims of manipulation and deceit?

11   A.   Not at the scene, but it's not unsurprising for victims at a

12   scene not to make any disclosure to law enforcement.  Human

13   traffickers often teach them and to instruct them not to trust

14   law enforcement when they speak to them.

15   Q.   Okay.  So what you're saying is no, they didn't and your

16   excuse is well, not that it's true, but that you think, you

17   know, it would happen that way because he is what you say he is.

18           MS. DUANE:  Objection, Your Honor.  Argumentative.

19           THE COURT:  Sustained.

20       BY MR. HOWARD:

21   Q.   Okay.  So what you're saying is none of those people

22   corroborate these victims.  Not a one.  Right?  These alleged

23   victims.

24   A.   At the scene, none of them made that report.  We've since

25   had individuals come forward though.

```
 1    Q.  So there were people who you interviewed at the scene who

 2    subsequently came forward to you and changed their story?  Is

 3    that what you're saying?  Certainly you remember.

 4    A.  I did not speak with any of the individuals at the scene, so

 5    I specifically can't say.  It was not informed to me that

 6    anybody alleged that they -- that any concerns were reported at

 7    the scene.  My concern with answering any questions is that I

 8    risk identifying any future victims in court.

 9    Q.  Well, I mean, you kind of brought that to a head by bringing

10    charges.  So the question is --

11            THE COURT:  Let's stick to questions, not speeches,

12    Mr. Howard.

13            MR. HOWARD:  Thank you.

14      BY MR. HOWARD:

15    Q.  Wasn't there somebody that you took from the scene that

16    wouldn't fit in this category of people that were on the scene?

17    Wasn't there a lady that was taken from the scene?

18            THE COURT:  Hold on.  Let's go back to facts here.

19    Okay.  She's already testified that there were at least six

20    individuals at the home at the time of the arrest, and that none

21    of them at that time made statements corroborating Victims One

22    and Two that she's aware of, but that subsequently one or more

23    of them have corroborated some of what Victim One and Victim Two

24    had to say.

25            MR. HOWARD:  I don't think that's what she said.  She
```

1    did not say --
2           THE COURT:  Well, as the fact finder that's what I
3    think I heard her say.  So let me ask you Special Agent Cavey,
4    do I understand your testimony correctly?
5           THE WITNESS:  Yes.
6           THE COURT:  Okay.
7       BY MR. HOWARD:
8    Q.  Okay.  Was there not somebody that was taken from the scene
9    that day?
10   A.  A female?
11   Q.  Yes.
12   A.  It was my understanding that victim services did take a
13   female to the home -- that she wanted to go home to her parents.
14   Q.  Okay.  And did she tell you -- did she corroborate Victims
15   One or Two?
16   A.  I have not spoken with her yet.
17   Q.  I know, but a lot of what you're telling us --
18          THE COURT:  Again Mr. Howard, there's been testimony
19   that nobody corroborated them on that day, so let's move on.
20   Okay.  You can go through each one individually, but the
21   testimony is none of them corroborated the other victims so --
22          MR. HOWARD:  She said at the scene, and there's one
23   that was not at the scene, and I'm trying to uncover whether or
24   not this person did or not.
25          MS. DUANE:  Your Honor, this is not a discovery

conference.

          THE COURT:  She's answered that question, so let's move

on.  She answered the question as to whether -- she said that

person was taken to her parents' home and to her knowledge,

she's not aware of that person saying anything else, so let's

move on.

     BY MR. HOWARD:

Q.  Is that your testimony, ma'am?  That this person did not say

anything else?

A.  That the person that was taken from the scene did not say --

she's -- she went with victim services to the home.  She's one

of the individuals we want to follow-up with.  It was my

understanding that in speaking with one of the victim services

coordinators that she spoke to, that she wanted to go home to

her parents' house.

Q.  Okay.  And that was the extent of the substance.

A.  For that individual, yes.

Q.  Okay.  So Victim Three is the person -- the person you

described as Victim Three is the person who called to be rescued

in Detroit, correct?

A.  Yes.

Q.  And we're moving forward now to Paragraph 23, and that was

the person who had started the lemon diet?

A.  Yes.

Q.  And she did so against her will?  Did she tell you that?

1    A.  She did not tell me that.

2    Q.  She did it of her own volition?

3    A.  At the encouragement of Mr. Foster and the other girls in

4    the house, yes.

5    Q.  Okay.  And she told you that she engaged in prostitution of

6    some sort?

7    A.  She did not tell me that.

8    Q.  Okay.  Did she tell you that she saw other people engaging

9    in prostitution or she just believes that they did?

10   A.  She had heard other -- the other girls discussing it.

11   Q.  Was Mr. Foster at all in Detroit at the time to your

12   understanding?

13   A.  Not to my understanding, no.

14   Q.  But she told you that she spoke to him a number of times?

15   A.  That she -- over the phone.

16   Q.  Over the phone?

17   A.  Yeah.

18   Q.  And you were able to corroborate with her phone records that

19   she did speak to Mr. Foster a number of times while she was in

20   Detroit or you didn't bother to do that?

21        THE COURT:  I'm not a jury, Mr. Howard.  That's not

22   effective.  Whether she bothered to do it or not, she either did

23   it or she didn't.

24        MR. HOWARD:  Okay.  Did you or didn't you?  I

25   apologize, Your Honor.  Old habits.

```
1              THE COURT:  Understood.

2              MR. HOWARD:  Thank you, sir.

3              THE WITNESS:  We attempted to corroborate by looking at

4     her phone.  I can't remember how many times or calls that were

5     placed, it wasn't -- whether she spoke with him on the phone

6     using her phone or another girl's phone.

7         BY MR. HOWARD:

8     Q.  She would have told you that.  The question is were you able

9     to corroborate it or not?  One call, two calls, any at all on

10    any phone.

11             MS. DUANE:  Judge --

12             THE COURT:  So again, to simplify the question Special

13    Agent Cavey, from anyone's phone records have you been able to

14    corroborate calls between Victim Three and Mr. Howard (sic) up

15    to this point?

16             MR. HOWARD:  Mr. Foster.

17             THE COURT:  Mr. Foster.  I'm sorry, Mr. Howard.  Yes.

18    Mr. Foster.

19             THE WITNESS:  I can't recall.

20             MR. HOWARD:  Okay, Your Honor.  I think that's all I

21    have.  Thank you.

22             THE COURT:  Wonderful.  Ms. Duane, any redirect of

23    Special Agent Cavey?

24             MS. DUANE:  Yes, Your Honor.  Briefly.

25             THE COURT:  Doesn't have to be brief.  Go ahead.
```

REDIRECT EXAMINATION

BY MS. DUANE:

Q.   Just to be clear Special Agent Cavey, how long have you been a part of this investigation generally?

A.   Generally since a couple of months after February of 2017.

Q.   And now opening it up from the four month period that defense counsel focused on in 2017, in connection with this investigation, have you subpoenaed bank records?

A.   Yes.

Q.   And have you received over 35, let's say, bank records for the Defendant, businesses of the Defendant, girls associated with the Defendant in connection with this case?

A.   Yes.

        MR. HOWARD:  Your Honor, is leading going to be okay? I don't want to object if it's okay.

        THE COURT:  To a point.  If you think -- if you think it's improper leading, you know, in that it's unfair, but if she's just sort of summarizing the scope of the investigation and it's expediting the testimony, I don't have a problem with it.

        MR. HOWARD:  Since she can proffer it, that's why I didn't know whether you allow it.

        THE COURT:  I'll allow a limited amount of leading, yes.

        MR. HOWARD:  Okay.  Thank you.

1          THE COURT:  You're free to object, but I'm going to

2     allow a limited amount.

3          MR. HOWARD:  Thank you, sir.

4     BY MS. DUANE:

5     Q.  Have you also subpoenaed deeds for residences owned by the

6     Defendant?

7     A.  Either through subpoena or through the certified records

8     process, yes.  I believe it's gone through the certified records

9     process.

10    Q.  So one way or the other --

11    A.  One way or the other they've been requested, yes.

12    Q.  And are those deeds for homes in the Miami and Broward area?

13    A.  Yes, as well as Las Vegas.

14    Q.  And were you able to then use those deeds -- well, I should

15    ask, did you also subpoena records from the DMV in connection

16    with Victim One and Victim Two, for example?

17    A.  I believe it's more through the certified records process

18    but yes, we requested records.

19    Q.  Okay.  I'm sorry.  I should have just asked generally have

20    you reviewed records from Victim One and Victim Two from the

21    DMV?

22    A.  Yes.

23    Q.  And are addresses associated with Victim One and Victim Two,

24    do they correspond to properties owned by the Defendant during

25    that time period?

```
1    A.  Yes.
2    Q.  Did you also subpoena or perceive or review flight records
3    for females within the Defendant's organization showing trips to
4    Las Vegas, for example, or New York?
5    A.  Yes.
6    Q.  Did you also review records for CVS, for example, or
7    Walgreens for Victim One, Victim Two and other females
8    associated with the Defendant that again correspond to addresses
9    that are linked to the Defendant during the time period of this
10   case?
11   A.  Yes.
12   Q.  Had you also received police reports that corroborate
13   statements given by Victim One and Victim Two in this case
14   during the time that they were with the Defendant?
15   A.  Yes.
16        MR. HOWARD:  Your Honor, can we have some specificity
17   as to what is being described, if it's something beyond --
18        THE COURT:  Yeah.  And also Ms. Duane, I did shut
19   Mr. Howard down a little bit when he was getting into the scope
20   of the investigation, so I've given you some leeway there but
21   again --
22        MS. DUANE:  Yes, Your Honor.  I'll move on.  The only
23   point is just that Mr. Howard obviously tried to make it sound
24   like the agents have done nothing here, and they have actually
25   done quite a good deal of an investigation.
```

```
 1              THE COURT:  I understand, but I'm more interested in
 2    the results of the investigation rather than the process of the
 3    investigation.  I've allowed you to make your record.
 4              BY MS. DUANE:
 5    Q.   Now Victim One and Victim Two, has law enforcement met with
 6    them separately throughout this investigation?
 7    A.   Yes.
 8    Q.   And has their reporting been consistent?
 9    A.   Yes.
10    Q.   And has it corroborated one another?
11    A.   Yes.
12    Q.   Do Victim One and Victim Two --
13              MR. HOWARD:  Your Honor, can we have some specificity?
14    I'm certain they're not talking about in all respects, and this
15    is misleading.
16              THE COURT:  Well it's -- I understand what she's saying
17    and I understand the point that's been made.  I'll overrule that
18    objection.
19              BY MS. DUANE:
20    Q.   Now, did Victim Three know Victim One or Victim Two?
21    A.   No, not to my knowledge.
22    Q.   And the reporting of Victim Three with regards to, let's say
23    the lemon diet, was that consistent with the reporting of Victim
24    One and Victim Two or at a minimum, Victim Two?
25    A.   Yes.
```

1    Q.  Now, is that the reason that you have not interviewed Johns

2    in this case at this time?

3    A.  Our primary concern is that they would alert him to the

4    investigation.

5    Q.  And has that been a concern throughout this investigation?

6    A.  It's been a substantial concern.

7    Q.  And why do you have that concern?

8    A.  Because our victims have told us that people remain -- that

9    some individuals will remain loyal to him because they have been

10   manipulated, or for whatever reason, and we did not want him

11   alerted too soon to the investigation.

12   Q.  And did Victim One and Victim Two express a fear of the

13   Defendant?

14   A.  Yes.

15             MS. DUANE:  No further questions, Your Honor.

16             THE COURT:  Thank you.  Special Agent Cavey, you may

17   step down.  Thank you very much.

18             THE WITNESS:  Thank you, Your Honor.

19             THE COURT:  Further evidence or proffer from the

20   Government?

21             MS. DUANE:  No, Your Honor.

22             THE COURT:  Government rests.

23             Any proffer or evidence from the Defense?

24             MR. HOWARD:  I have nothing, Your Honor.  Thank you.

25             THE COURT:  All right.  Thank you.

1            Argument from the Government.

2            MS. DUANE:  Yes, Your Honor.  The Government would ask

3    the Court to detain the Defendant based on both danger to the

4    community and risk of flight.

5            THE COURT:  I'm sorry, Ms. Duane.  I apologize, but

6    before you get into the argument, I have a couple of factual

7    questions relating to the Pretrial Services Report.  It

8    indicates -- let me just start with the most recent -- that

9    Mr. Foster has a currently pending charge in state court; is

10   that correct?  Looks like he was charged in July of 2019 with a

11   driver's license offense and he has a plea conference scheduled

12   in a few weeks.  So he is currently on release on a state

13   charge?

14           MS. DUANE:  That is not my understanding.  That is not

15   my understanding, Your Honor.

16           THE COURT:  Okay.  Also there were other -- I'm looking

17   at his criminal history here and Mr. Howard, I'll give you a

18   chance to respond as well.

19           MR. HOWARD:  Sure.  Thank you.

20           THE COURT:  But there's a number of -- between 2004 and

21   the present, a number of driving violations and other instances

22   where Mr. Foster appears to have been in and out of the criminal

23   justice system.  And my question was during those occasions, was

24   he ever on release, pretrial release or probation or court

25   supervision of any kind if anybody knows?

1          MS. DUANE:  My understanding is, Your Honor, just from
2     reviewing the Pretrial Services Report in 2004 and 2005, there's
3     a violation of probation and a failure to appear.  Those are the
4     only two that I'm aware of.
5          THE COURT:  But I guess my question is in these other
6     situations for example, just take the next one down, September
7     7, 2009 *(sic)* is listed as the date of his careless driving, but
8     the charges are pending until December.  So I guess what I'm
9     inquiring, one of the factors I have to consider under the Bail
10    Reform Act is whether this Defendant has continued to commit
11    crimes while on court supervision in the past, and that's what
12    I'm just trying to discern is whether there were occasions
13    during the periods of time relevant to this complaint that he
14    was on court supervision.  If the Government doesn't know,
15    that's fine, I can reach my own conclusions from the Pretrial
16    Services Report.  But I'm just inquiring if you know for
17    certain.
18         MS. DUANE:  No, I don't know for certain, Your Honor.
19    I would note that obviously our time period for this case is
20    2004 to present, and the Defendant does have a number of
21    adjudication withhelds which usually relates to some sort of
22    probationary sentence.
23         THE COURT:  Okay.  And Mr. Howard, I'll give you a
24    chance to factually address that question when it's your turn.
25         I'm sorry, Ms. Duane.  I cut you off from your

1   argument, so I'll let you continue.  I apologize.

2         MS. DUANE:  Your Honor, I would just note again that

3   this is a presumption case.  Under two different portions of the

4   statute there is no bond that would either ensure the safety of

5   the community or the Defendant's appearance.

6         With regards to danger Your Honor, the Defendant has

7   been involved in a long-term conspiracy to traffic females.  The

8   reporting of Victim One, Victim Two and Victim Three shows a

9   pattern of conduct where the Defendant recruits vulnerable

10  females, has sex with them, makes promises to them, exploits

11  them and lies to them.  And one of the issues that Defense

12  Counsel went into was kind of asking questions about the lemon

13  diet for example, why that's in the complaint.  And one of the

14  reasons is because it shows a consistency of conduct.  This

15  Defendant has been doing this for a long time.  He has the same

16  M-O and these victims, while they're years apart, they

17  corroborate one another.

18        Beginning at least as early as 2004, the Defendant has

19  actively sought minors and adult females who come from difficult

20  backgrounds to work for him at strip clubs and engage in

21  prostitution.  He's used violence, threats of violence, coercion

22  to keep these girls in his organization and he's lied to them.

23  He's told them that the money that they make each night from

24  selling their bodies was going to be invested into businesses

25  for their early retirement.  In reality, the women who

1   ultimately found the strength to leave him left with no money,

2   no earnings, no shares in any of these businesses that they sold

3   their bodies for.

4         Most recently in August of 2019, the Defendant

5   recruited a girl into his organization, again making the same

6   promises that she would make all of this money through

7   investments, and did not tell her that she was expected to have

8   sex for money until after he sent her on a flight to Michigan, a

9   place where she was not familiar with, in order to work.  The

10  most recent victim did not feel free to leave and ended up

11  calling the sex trafficking hotline in order for law enforcement

12  to remove her from the situation.

13        The Defendant's criminal history reflects a prior

14  charge for conspiracy to endanger the welfare of children and

15  endangering the welfare of children, and that's from 1998, Your

16  Honor.  But that is the facts and circumstances surrounding that

17  case are that the Defendant was having minors engage in

18  prostitution and working at strip clubs in New Jersey.  He also

19  has a conviction for aggravated battery with great bodily harm,

20  a violent crime.  He also has a pretty significant and

21  consistent history of driving infractions including driving

22  without a license, which shows a total disregard for the law

23  consistently throughout the course of this case.

24        The Defendant's conduct demonstrates that he is a

25  danger to the community.  Females have expressed a very real

1    fear of the Defendant.  And even with him now incarcerated, they

2    fear for their safety.  And to be clear Your Honor, not only

3    minor females, but also adult females who have been preyed on,

4    lied to and exploited by this Defendant.  I know one of the

5    conditions that Pretrial Services was suggesting in their report

6    was that the Defendant not have contact with minors, but that

7    simply doesn't solve the issue here.  The Defendant was also

8    actively recruiting, and most recently the girls that were

9    within his organization were all adults.

10           I think some of the best evidence that the Defendant is

11   preying on these vulnerable victims is the Defendant's very own

12   website, the website that he admitted that he had created on his

13   own behalf, Foster'sCareInc.  That website specifically

14   advertised services for sex trafficking victims, again providing

15   a vulnerable victim population for the Defendant to exploit.

16           Your Honor, the Defendant is also a risk of flight.  He

17   has a history of extensive travel.  He's lived in New York, New

18   Jersey and Las Vegas at various points throughout this

19   conspiracy.  As the Pretrial Services notes, he also has owned a

20   number of properties in various places.  He was in Las Vegas as

21   shortly as a week before the search warrants were executed last

22   week.

23           The Defendant also has a history of using aliases

24   including William Cortez and Frank Herman Cruz, as well as other

25   social security numbers and dates of birth.

1          He also has a prior conviction for possession of an

2    unlawfully issued driver license, and a past violation for

3    failure to appear and a violation of probation.

4          Also as I outlined in the factual proffer, the

5    Defendant's passport photograph, or what appears to be a

6    passport photograph, was recently found on the electronic device

7    of a suspected fraudulent document producer who makes fraudulent

8    passports for people in other countries.

9          As outlined in the pretrial services report, the

10   Defendant has access to funds both in his name and other

11   people's names, including his main girls and business names such

12   that law enforcement could not keep track of the Defendant's

13   flow of money from all of these various accounts.

14         Your Honor, the Defendant is also facing significant

15   time.  He's facing a mandatory minimum of 15 years, a statutory

16   maximum of life.  We believe that his guidelines range will be

17   approximately 210 to 262 months based on his conduct for

18   acceptance of responsibility, which is a lot of time for

19   somebody who has only previously served three months in prison.

20         Yeah.

21         Your Honor, the women have been coming forward since

22   the Defendant was arrested, and that is in large part due to the

23   fact that they now feel safe and that now feel they can contact

24   law enforcement without fear of retribution, and this is largely

25   because the Defendant is incarcerated.  Should this Defendant be

1    released, that would all go away.  The victims that are already

2    identified, while we've made every effort to protect their

3    anonymity, the Defendant likely knows who they are and they have

4    all expressed a very really concern for their safety if the

5    Defendant is released, and even frankly if he's not released,

6    because of his associates who can act on his behalf.

7              Your Honor, I would point out as well that probation

8    recommended that Hanah Chan be a co-signer in this case.  That

9    is a problem.  She is one of the Defendant's main girls, and

10   there's evidence that she was involved in the transportation of

11   Victim Three most recently.  She is also listed on the corporate

12   records for Foster's Care, Inc.

13             Finally Your Honor, my co-counsel has done some

14   diligence online for the most recent, I believe, pending case

15   from July of 2019, and it does appear from the Broward County

16   records -- I'll let her speak.

17             MS. OBENAUF:  Your Honor, if I may be heard?

18             THE COURT:  Sure.

19             MS. OBENAUF:  So it looks like the Pretrial Services

20   Report is correct.  So I have a copy of the citation I can show

21   Mr. Howard, but it looks like on July 3, 2019, the Defendant was

22   stopped in Boynton Beach and was cited for driving on a

23   suspended license.  That was July 3, 2019.  According to the

24   complaint, Victim Three was recruited in mid August of 2019.  It

25   looks like the Defendant has had multiple court appearances and

1   is scheduled for a plea conference on December 9, 2019.

2           THE COURT:  Okay.  But he's -- he has appeared for all

3   of his court appearances on that case while on bond?

4           MS. OBENAUF:  So I don't see any failure to appear, if

5   I can look it would probably just take me a minute.

6           THE COURT:  Sure.  This is why it's good to have former

7   assistant state attorneys in the office.  They know how to

8   actually read those records.

9           MS. OBENAUF:  Yeah, I don't see where he ever failed to

10  appear.  It looks like he had an attorney.

11          THE COURT:  Okay.  That's helpful.  Thank you.

12          Anything else Ms. Duane?

13          MS. DUANE:  No, Your Honor.  We just believe based on

14  the evidence that's been presented that there's no set of

15  conditions or combination of conditions that would assure these

16  victims' safety, or that the Defendant would appear in this case

17  where he's facing such significant time, and we would ask that

18  the Defendant be detained.

19          THE COURT:  Thank you very much, Ms. Duane.

20          Mr. Howard?

21          MR. HOWARD:  Yes, Your Honor.  Your Honor, it has not

22  escaped my attention that there is an allegation of the offense

23  conduct taking place over the space of 15 years, and the only

24  substantive allegation of violence is somebody who ultimately

25  left on her own accord and came back saying that once he pushed

1    her down on the couch and punched her.  That does not tend to

2    suggest that there was a climate of violence or we would have

3    heard a lot more of it.  Other than this one isolated incident

4    and the manner in which it was phrased tend to suggest it was

5    the only one that was referenced by her or the other alleged

6    victims who they have contacted.

7        The notion that we are investigating and people are

8    feeling free to come and talk to us because he's locked up and

9    it will interfere with our investigation if you grant him his

10   constitutional right to be afforded a bond if he is neither a

11   risk of flight nor a danger is not a ground for the Court to

12   consider.  The fact that they feel like they're in danger, one,

13   seems not to be predicated on any facts that the Government,

14   with all this time we've been here, has been able to

15   substantiate; and two, if they feel fear for their safety

16   whether he's locked up or not, then it makes it a moot issue.

17       There is a lengthy record of contact with the criminal

18   justice system, and I think the primary reason is a reason why I

19   came to know Mr. Foster in the first place; because very shortly

20   before he was arrested on this matter, I was contacted

21   concerning what is referenced on Page 1 of the Pretrial Services

22   Report which was that when he was born, his birth certificate

23   said Foster, his social security number carried the name of his

24   other parent, Cortez, and since then or since adulthood, it has

25   caused him an enormous amount of aggravation concerning getting

1    his license straightened out because the system registers him as

2    one when he's contended to be the other and vice versa.  He

3    claims his legal name is Foster and that's what he travels

4    under.  That's what everybody knows him by.

5         But the multiple instances of contact with law

6    enforcement concerning his driving record seems to be as a

7    result of an unfortunate circumstance initiated at birth by the

8    incongruence between his birth certificate and his social

9    security card, something which he has been seeking to address.

10   I would think it would be probably -- be fairly about two and a

11   half, three months ago that he was referred to me in that regard

12   and that's how I came to know him.

13        Your Honor, it was also very interesting, and I think

14   telling, that we have Victim One and Victim Two and it's kind of

15   a circular argument.  Victim One and Victim Two tell us that you

16   can't talk to anybody else to verify the veracity of what they

17   say because they're not going to tell you the same thing we're

18   telling you because they're being manipulated and we're not,

19   which is the type of circular argument that leads to a denial of

20   due process.  So they're relying exclusively on these two

21   people, now a third, and candidly they have referenced that

22   others have come forward but they -- we know nothing about it so

23   I'm not sure that we can rely on that fairly.  But there's no

24   indication as to what ulterior motive they may have; whether or

25   not -- we know that they left, we know that one went back and

left again, and that suggests that they were not compelled to
stay.  And if they were there of their own volition, whether or
not the living arrangement was unorthodox, it doesn't make it
criminal.

        And everything that that Agent and the Government was
able to reference that they corroborated is innocent conduct.
Well, we corroborated that they took flights, we corroborated
that houses are owned, we corroborated that whatever it was.
They didn't corroborate the one thing they may have
corroborated, which would at least implicate some kind of
criminal conduct, was going down to Gold Rush and saying hey,
did this happen, does anybody here know about this, was anybody
here when this may have occurred.  They didn't even do that.
What they did is they got a bunch of records and then they said
well, these ladies are telling the truth and they're telling the
truth so much that we can't even go and talk to anybody else and
verify it.

        They talked about not talking to Johns.  They weren't
talking to other alleged victims either.

        So I agree that the allegations as made are concerning,
and I understand that the Government is doing what they believe
to be right, but they're in the same compromised position that
I'm in which is neither of us were present for any of this
alleged criminal conduct, and they're in the beneficial position
of knowing that they spoke to people who contradicted the

1   victims, the alleged victims.  I know that I haven't had access

2   to the alleged victims, but I've spoken to people that have

3   contradicted the alleged victims as well.  So we have some

4   people saying one thing, other people saying another, but then

5   they say well, you've got to expect them not to tell you that,

6   and what they're saying is not the truth because they're being

7   manipulated, which is a circular argument.

8           I think with the level of the case as it stands now,

9   the weight of the case as it stands now, it would be unfair to

10  assume it all to be true and to say this man should not be

11  afforded his liberty pending the Government meeting its burden

12  of proof.  Half of the pot is saying this is not what's

13  happening, the other half of the pot is saying it is.  I

14  understand that's of concern, but the Court can address any

15  issues with regard to flight by putting him on an ankle bracelet

16  and restricting him.  He could be on total house arrest, and we

17  are offering that up as a condition, with GPS monitoring, and we

18  think that that would be a fair disposition of this hearing.

19          THE COURT:  Okay.  Thank you very much, Mr. Howard.

20          Anything further, Ms. Duane, in response?

21          MR. HOWARD:  I'm sorry.  One more thing, sir.

22          THE COURT:  Yes, of course.

23          MR. HOWARD:  Mr. Foster's sister and brother are here

24  and they're willing to sign on the bond so we don't have to

25  worry about Ms. Hanah Chan.

1    THE COURT:  Very well.  Thank you very much.  And thank

2    you both for being here.  I'm sure it means a lot to Mr. Foster

3    that you're here.

4    MR. HOWARD:  Thank you, Your Honor.

5    THE COURT:  Yes.  Ms. Duane, any further response?

6    MS. DUANE:  Your Honor, I just want to correct the

7    mischaracterization that we haven't approached victims or done

8    certain things in this case because the victims don't want their

9    story to be undermined or something to that extent, the victims

10   that came forward.  The reality is that Victim One and Victim

11   Two were with the Defendant for a long period of time.  They are

12   fearful, and the way in which we have conducted this

13   investigation has been corroborating every step of the way, but

14   being mindful of the fact that many different avenues that we

15   could turn to, Johns for example, speaking to the strip clubs,

16   for example, where the Defendant has his girls employed would

17   ultimately lead to the Defendant being notified of this

18   investigation and obviously limit law enforcement's ability to

19   conduct it efficiently.  So I just want to -- this isn't about

20   Victim One and Victim Two being concerned or contradiction or

21   anything to that extent; it's merely law enforcement's effort to

22   conduct an investigation in such a way that we do not want the

23   Defendant to be notified.

24   And to keep in mind that Victim One and Victim Two are

25   very fearful of this Defendant.  Your Honor, respectfully,

```
 1    there's -- releasing the Defendant on a bond just doesn't deal
 2    with the allegations that are made in this case.  At the time
 3    that the Defendant was -- the search warrant was done of the
 4    Defendant's residence, one of the girls who was working for him,
 5    working as a prostitute, was at his house.  I don't know where
 6    the Defendant would live that would make law enforcement
 7    comfortable that he wouldn't be victimizing other females when
 8    there has been a pattern, over time, of him doing this for so
 9    long.
10          Your Honor, we just -- based on what's been presented,
11    I don't believe that the presumption in this case has been
12    rebutted that this Defendant can be released, and we would ask
13    for him to be detained.
14          MR. HOWARD:  Just one substantive matter, Your Honor.
15          THE COURT:  Sure.
16          MR. HOWARD:  When the Government said there was nowhere
17    he could live, there was a gentleman who raised his hand in the
18    back and said he would be willing to have him live with him.
19          And with respect to the argument -- I'm not contending
20    the fact that they can't do -- it doesn't really matter why they
21    have proceeded in the way they do -- they have in terms of their
22    investigation.  I respect it, it's their decision.  But they
23    can't come and say we can't offer more because we couldn't do it
24    that way and therefore, we don't have the goods.  That's
25    insufficient.
```

1          THE COURT:  Understood.  Understood.  And also I

2     appreciate Ms. Duane's view, but it's not up to whether law

3     enforcement would be comfortable if he's released, I have to

4     live with this decision.  It's my decision to make, not theirs,

5     so it's whether I would be satisfied.

6          So Mr. Foster, I have to determine -- let me start by

7     saying what I don't have to determine and what I'm not deciding

8     today.  I don't have to decide whether you committed these

9     crimes or not.  That is not for me to decide today.  Okay.  So

10    we've heard a lot of testimony about what the evidence is the

11    Government has, what evidence the Government doesn't have; what

12    are they going to prove, what are they not going to prove, how

13    are they going to prove it, and at some level that's not the

14    decision I make today.

15         The decision I have to make is whether the Government

16    has met its burden of proving one of two things:  Either that

17    there is no combination -- condition or combination of

18    conditions that would reasonably assure, not ensure, reasonably

19    assure that you're going to show up in court as required.

20    That's the first thing I have to decide, are you going to show

21    up or not.

22         Now, the allegations in the crime and the evidence

23    against you, as I'll speak about in a second, are relevant to

24    that.  But that's what I have to decide.  Is it -- can I

25    establish conditions that would make you show up.  And have they

1    proven by a preponderance of the evidence, meaning it's more

2    likely than not, that I can't.  That's the first question.

3    Independent.

4              Second question is if I release you, are there

5    conditions that I could impose that would make sure that you're

6    not a danger to the community, to any individual or to the

7    community at large.  And as to that, the Government has the

8    burden of proving by clear and convincing evidence that there

9    are no conditions that I could set that would reasonably assure

10   the safety of the community that is -- and clear and convincing

11   evidence is a very high standard.  It's evidence sufficient to

12   create an abiding conviction that future danger is highly

13   probable.  That's what the law requires me to look at.  So

14   that's what I'm here to decide.  Not whether you committed these

15   crimes or not.

16             So the way I do that is first, I assess what risks are

17   there.  What risk, if any, do you present.  And then having

18   determined that, what, if any, conditions can I set that would

19   mitigate that to the level that I'm reasonably assured that

20   you're going to do what you're supposed to do.

21             Now, as the Government has pointed out multiple times,

22   and they are correct, I do find that there's probable cause to

23   support the offense as alleged in the complaint based upon the

24   information contained in the complaint and the testimony of

25   Special Agent Cavey, and I do credit and find credible the

1    testimony of Special Agent Cavey.  I found her testimony to be

2    compelling, and I found her to be very careful in her testimony,

3    and I found her to be accurate in her testimony.  When she knew

4    it, she said it; when she didn't know it, she didn't say it.  So

5    I give credit to her testimony.

6          So relying upon her testimony and her sworn affidavit,

7    I do find probable cause, which is a lower standard, but I do

8    find probable cause that the offenses alleged in the complaint

9    have been committed.  And because I make that finding, the

10   Government is entitled to a statutory presumption.  What that

11   means is that there's a presumption, so I start from the

12   presumption, that there are no conditions that I could set that

13   would reasonably assure that you would appear and that would

14   reasonably ensure the safety of the community.  But that's a

15   presumption that can be overcome.  So it's evidence, I have to

16   look at it as evidence, but it's evidence that can be

17   counter-balanced by other evidence.  But that certainly weighs

18   into the fact that I have to start from the belief that you are

19   a substantial risk of both of those things.

20         What else do I have to look at.  I have to look at the

21   nature and circumstances of the offense.  The nature and

22   circumstances of this offense is the exploitation of children

23   and the exploitation of women and it is, by its nature, a crime

24   of violence, and so I have to consider that.  That doesn't weigh

25   in your favor.  That's a factor I have to consider.  It does not

81

1   weigh in your favor.  Whether you committed the crime or not,
2   based on my findings as to probable cause, I have to weight that
3   against you.  I have to look at the weight of the evidence
4   against you and I have to tell you Mr. Howard is an outstanding
5   lawyer and did a very good job of cross-examining the agent and
6   trying to poke holes in the evidence that the Government has,
7   but I do particularly find compelling the fact that Victim Three
8   tells -- gives testimony that is consistent with Victims One and
9   Two, and there is no evidence they know each other and that is
10  always, to me, a fact that suggests truthfulness.  When I'm
11  telling the same story as somebody I've never met before, it's
12  less likely that we concocted the story.  Mr. Howard pointed out
13  Victim One and Victim Two did overlap at the location, they do
14  know each other, but I also do find there's sufficient overlap
15  in their testimony that I do find it credible as to the weight
16  of the evidence.  So there is evidence against you, there's
17  substantial evidence against you.  It's not the strongest case
18  I've ever seen; it's not the weakest case I've ever seen.  But
19  that's not for my to decide.  There will be a jury and you'll
20  get a lot of steps between here and there as to whether they can
21  actually prove this case.  But based on the record before me,
22  there is substantial weight to the evidence.
23          I also have to look at the history and characteristics
24  of the Defendant including his character, physical and mental
25  condition, family ties, employment, financial resources, length

1    of residence in the community, past history, criminal history,
2    record concerning appearances in court and whether you've
3    committed crimes in the past while on supervision.  So let me
4    run through a couple of those, so I'm going to cut both ways.
5    One is family ties.  Clearly you've got strong family ties.
6    You've got family members here to support you.  You've got a
7    long time residence in this community and that cuts in your
8    favor.  And the fact that you have family members who would be
9    willing to sign on a bond and who would be willing to have you
10   come live with them is certainly a strong factor in your favor,
11   primarily as to whether I feel you would show up in court as
12   required.  The fact that you've been in trouble with the law a
13   lot in the past, but you've always shown up in court, at least
14   according to what I see here.  You've got one failure to appear,
15   so that cuts in your favor that you've always shown up in the
16   past, suggests to me that you would show up now.
17           However, you also have a history, and it's again based
18   upon the evidence before me, you have a history of continuing to
19   commit these crimes while on court supervision, including most
20   recently the incidents involving Victim Three and the fact that
21   you would continue to commit violent crimes while on court
22   supervision gives me great pause, not as to whether you're going
23   to show up to court or not, but as to whether I can safely
24   release you into the community, because you've been released
25   before and apparently continued to commit these kind of crimes.

1   So that gives me great pause.

2         And then I also, on top of all of that, I have to

3   consider generally the nature and seriousness of the danger that

4   would be posed by your release in this case, and there is --

5   I'll discuss that in a second.

6         So that's the risk I have to look at.  What are the

7   factors I have to consider in terms of mitigating that risk.

8         Let me talk first about the risk of flight or

9   nonappearance.  It's not the risk of flight, it's not the risk

10  that you'll run away, it's the risk that you won't come back to

11  court.  So you can be living right down the street, but if

12  you're not going to show up, I can't release you.  On the other

13  hand, if you live in California but I'm satisfied you're going

14  to come back, I can release you.

15        I do believe there are conditions that I could set in

16  this case that would reasonably assure that you show up.  As

17  Mr. Howard suggests, I can put you on house arrest, I can put

18  you on a GPS monitor, other conditions that Probation suggested,

19  get co-signatories from your family members, put them at

20  financial risk if you don't show up.  So I think I could cobble

21  together something that would reasonably assure me that you

22  would be here.  So I don't think the Government's met its burden

23  of showing by a preponderance of the evidence that there are no

24  conditions I could set that would cause you to show up in court

25  and as to that, I do believe that the presumption has been

84

1   overcome.

2           I don't agree as to danger to the community.  I do

3   believe the Government has met its burden, particularly starting

4   with the presumption that I have to start with.  So I have to

5   start with the assumption that there are no conditions that I

6   could set then you have to overcome -- well, you have to present

7   evidence or evidence has to be presented -- ultimately the

8   Government bears the burden.  I want to make sure the record is

9   clear that I'm holding the Government to the burden.  They have

10  to prove it by clear and convincing evidence.  They just start

11  with a little bit of a thumb on the scale, and Mr. Howard did a

12  very good job in introducing some evidence in the other

13  direction.  But when I balance all the evidence before me, I do

14  find the Government has met its burden of proving by clear and

15  convincing evidence that there are no conditions I could set

16  that would reasonably assure the safety of the community and in

17  particular, the safety of the individuals who formally were

18  associated with you.  At a fundamental level, enticing someone

19  into a life of prostitution is itself an act of violence, and so

20  that can be accomplished whether you're in jail or out of jail.

21  I understand that.  But there is evidence of physical violence

22  in the past.  It's just easier for someone who's out to continue

23  to commit these kind of crimes and to continue to prey on

24  individuals, and so I am not as -- I agree with Mr. Howard, I

25  don't think the fact that it would impede the Government's

1   investigation is something that I should take into account and

2   it is not something that I take into account, but I do believe

3   that there is a real risk here that people who -- a risk of what

4   I would consider witness intimidation or witness tampering.  Not

5   necessarily by you directly, but this is a crime that at least

6   on the record before me has involved multiple individuals who

7   presumably acted at your direction and under your control.  And

8   so I have great fear that if you were released, whether you

9   directly -- even if I put you in a house and didn't let you out

10  of the house, you have other people that work with you who you

11  could persuade, induce, manipulate, whatever words you want to

12  use to tamper with witnesses, and that puts those witnesses at

13  risk.

14          So for all those reasons, I'll enter a written order

15  summarizing my findings, but I do find there is no condition or

16  combination of conditions that would reasonably assure the

17  community and so you'll be detained pending trial.

18          Very nice job, Mr. Howard.  I want you to be clear,

19  Mr. Foster, I am not detaining you because your lawyer was not

20  very, very good and didn't do everything he could today.  I'm

21  detaining you because as I read the law, that's what I have to

22  do, so I want you to understand that.

23          All right.  So we have an arraignment date, I think,

24  for December 9th.

25          Is there anything else we need to do this afternoon,

1    Ms. Duane?

2              MS. DUANE:  No, Your Honor.

3              THE COURT:  Mr. Howard.

4              MR. HOWARD:  No, sir.  Thank you for taking the time to

5    explain.

6              THE COURT:  Very well.

7              MR. HOWARD:  And your careful consideration.

8              THE COURT:  My pleasure.  Mr. Foster, I don't know if

9    I'll see you again in this case, but good luck to you, sir, and

10   we'll be in recess.

11             COURTROOM DEPUTY:  All rise.

12             (PROCEEDINGS CONCLUDED)
                                  * * * * *
13                      C E R T I F I C A T E
     I certify that the foregoing is a correct transcript from the
14   digital audio recording of proceedings in the above-entitled
     matter.
15
     12/11/2019_____        /s/ Dawn M. Savino___
16   Date                     DAWN M. SAVINO, RPR

17                      I N D E X

18                      WITNESSES

19   ALL WITNESSES:                               PAGE:

20   For Government:

21     Special Agent Kelly Cavey:
         Cross-Examination by Mr. Howard          15:22
22       Redirect Examination by Ms. Duane        59:1

23                      EXHIBITS

24   None

25